STATE of Missouri, Respondent,

v.

William Lee APEL, Appellant.

No. WD 63590.

Missouri Court of Appeals, Western District.

Feb. 22, 2005.

Andrew C. Webb, Sedalia, MO, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Andrea Mazza Follett, Asst. Attorney General, Jefferson City, for Respondent.

Before HAROLD L. LOWENSTEIN, P.J., JAMES M. SMART, JR., and EDWIN H. SMITH, JJ.

PER CURIAM.

William Apel appeals his convictions of two counts of first-degree drug trafficking, § 195.222.8, and one count of possession of a precursor chemical with the intent to create a controlled substance, § 195.420.1. Apel challenges the trial court's rulings on discovery and evidentiary matters, and also asserts that the lawfully admitted evidence was insufficient to convict. We find his points IV through VIII to be such that our resolution of those points is without jurisprudential value. We resolve those points by summary ruling under Rule 30.25(b) and furnish a memorandum concerning our analysis to the parties. We will thus undertake in this opinion to discuss only Points I, II and III, in which

Apel asserts that the trial court erred in failing to suppress evidence on Fourth Amendment grounds.

## Statement of Facts

At trial, the State presented the following evidence. On April 11, 2002, Corporal Brian Daniel of the Missouri State Highway Patrol received information from an unknown woman that a Pettis County residence (which was subsequently revealed to be Apel's residence) housed an active methamphetamine laboratory. The woman revealed this information to Daniel after he had made a traffic stop. Daniel followed up on the evidence, visiting the residence that day. No one answered his knock at the door, and he left.

The next evening, Daniel returned to Apel's residence. While driving in his car with the windows down along a gravel road that came to within about 50 or 60 feet from the house, Daniel smelled a strong chemical odor. He recognized this odor as the type produced when methamphetamine is being "cooked." Having been told that the house may contain a scanner, he turned around and headed in the other direction so that he could avoid detection while he attempted to obtain assistance from other officers. Immediately after turning the car around, he saw a black truck pull into the residence. Daniel changed his plan, turned around again and drove back toward Apel's home.

When he reached the outside of the residence, he spoke with Apel, who had just exited the truck. Apel evidently identified himself as a resident of the premises.

I indicated that we were looking for a subject, and I asked him who was in the residence, and he indicated he was unaware of who was in the residence. I asked him if he would care to take me inside the residence to identify the other occupants.

Apel "initially hesitated," said Officer Daniel. "However, he indicated he would take me into the residence," and Apel did so. Inside the residence, Daniel smelled a strong odor that he believed was anhydrous ammonia. He saw, in plain view, a scanner and several radios in the living room and a fan that was operating in the kitchen window. Daniel also saw two occupants, Teresa Petree and Michael Wormsley. Petree was standing in front of the kitchen sink with a bottle of bleach nearby. Officer Daniel asked Wormsley some questions. Shortly thereafter, he took both occupants outside and placed them under arrest.

Officer Daniel further questioned Apel regarding the residents of the house. Apel told him that a young man named "Dustin" (who was later identified as Dustin Tietge) lived with him at the house. Apel agreed to show the rest of the house to Daniel, who could smell the same strong odor emanating from a room in the back of the house. Apel opened the door to the room, which was an unfinished back porch; the strong odor burned Daniel's eyes, nose, and lungs. In plain view, Daniel observed a glass Mason jar containing a bubbling liquid. Daniel secured Apel in front of the residence and contacted the Sheriff's Department for assistance.

Without obtaining a search warrant, additional officers (including Officer Troy Blunt) arrived at the house and processed it for evidence. In a bedroom, they found a baggie of chunky white powder, which subsequently tested positive for 20.85 grams of methamphetamine; three blister packs of pills and some unused baggies; a respirator mask; and marijuana paraphernalia.

They also found three jars in plain view on the counters. Testing revealed the contents of these jars to be 25.55 grams of

powdered pseudoephedrine, 50.79 grams of pseudoephedrine, and 100.95 grams of liquid methamphetamine, respectively. A search of the kitchen cabinets revealed Prestone starting fluid, liquid Heet, canning jars, and coffee filters.

They also found jars on the back porch. Testing revealed the contents of these jars to be 48.84 grams of liquid methamphetamine, 9.27 grams of powdered methamphetamine, and 21.14 grams of liquid methamphetamine. The search of the porch produced three empty Prestone cans as well. Prestone and Heet are sources of ether, which is often used to manufacture methamphetamine.

Similar drug-related products were found throughout the rest of the house. In Apel's bedroom, the officers found scales customarily used by drug dealers and two Wal–Mart receipts dated several weeks earlier for the purchases of Heet, salt, starting fluid, and a "twin window fan." The search of Apel's bedroom also revealed a decongestant box, an empty salt container, and a full salt container. The officers knew that salt could be combined with muriatic acid to create the hydrochloride used in methamphetamine production.

In a disabled truck parked outside of the residence, officers found tubing typically used to link anhydrous ammonia "nurse tanks" to propane tanks. Other evidence relating to anhydrous ammonia production—an Igloo thermos and a ten-gallon propane tank—was found throughout the rest of the house.

At a bench trial, Apel testified in his own defense that he had no knowledge of any drug-related activities taking place in his house on April 12, 2002, or at any other time. He also said that when he left for work at 6:45 a.m. on April 12, none of the incriminating evidence that was found later that night was in his residence.

He also presented the testimony of Teresa Petree, one of the persons found in the house on the day in question. Petree had pleaded guilty to possession of the proscribed substances found in Apel's home. At Apel's trial, Petree admitted that she and Dustin Tietge were engaged in methamphetamine production at Apel's home on that day. Petree said that she did not arrive until around noon, after Apel had already left for work in the morning. She also testified that she brought a number of the ingredients required to manufacture methamphetamine. However, Petree's testimony failed to account for all of the evidence discovered in the house. She did not account for the methamphetamine discovered in the freezer and the kitchen cabinets.

The court convicted Apel of two counts of first-degree trafficking and one count of possession of a precursor chemical. The court sentenced him to two fifteen-year terms for the trafficking counts and one seven-year term for the possession count, with all sentences to run concurrently.

Apel appeals.

### Search and Seizure

In his first three points on appeal, Apel argues that the trial court erred in refusing to exclude evidence on the basis of his claim of an unreasonable search and seizure.

At the outset, we note that the parties dispute whether Apel has preserved this issue for appeal. The State is correct that Apel's failure to object at trial to the admission of the evidence constitutes a failure to preserve the issue for appeal. *See State v. Cosby*, 976 S.W.2d 464, 467 (Mo.App.1998). Nonetheless, here, the trial court declined to rule on the pre-trial motion to suppress and instructed counsel that the motion would be taken with the case, and a ruling reserved for

after trial. Counsel obviously understood that the court would consider his objection preserved even if not made at trial. Accordingly, here, we will exercise our discretion to treat the pre-trial objection to admission of this evidence as though the same objection was made at trial.[1]

The issue presented here is a question of law—whether the evidence discovered in Apel's home was the result of an unreasonable search and seizure. *State v. Werner*, 9 S.W.3d 590, 595 (Mo. banc 2000). As for the evidence, we view it in the light most favorable to the trial court's decision even if we are convinced we would have weighed it differently. *State v. Kriley*, 976 S.W.2d 16, 19 (Mo.App.1998). We will not reverse the ruling if it is plausible in light of the record as a whole. *Id.*

The evidence reflects that an anonymous tip led Officer Daniel to Apel's residence, where he smelled an odor indicating methamphetamine was being produced. Daniel approached Apel, who had just driven up to the residence, told him that he was looking for a subject, and asked Apel if he would take the officer inside the house to identify the occupants. According to Officer Daniel, Apel agreed to allow him to enter for the purpose of identifying the occupants. Once inside, Officer Daniel saw two occupants and several incriminating items in plain view. He also experienced more of the strong odor, which he said burned his eyes, nose, and lungs. Officer Daniel "secured the area." Daniel called for assistance. Other officers arrived and searched the house and the curtilage. At no time did an officer obtain a search warrant.

At trial, the State introduced as exhibits the fruits of Daniel's search for occupants and the fruits of the subsequent search for evidence. It is the admission of this evidence that Apel contests.

■ The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against *unreasonable searches and seizures*." U.S. CONST. amend. IV (emphasis added). Generally, the warrantless entry and search of a home is presumptively unreasonable and violates the Fourth Amendment. *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *see also State v. Kimberley*, 103 S.W.3d 850, 856 (Mo.App.2003). Thus, the entry and search at issue is valid only if justified by a recognized exception. *Kriley*, 976 S.W.2d at 21.

■ Initially, we address Apel's argument that the lack of reliability of the informant's tip invalidates the search. Officer Daniel went to Apel's residence in response to an anonymous tip that methamphetamine was being produced at the home. Apel argues that this information did not establish probable cause because Daniel had no prior experience with the tipster.

■ Apel fails to recognize that Corporal Daniel did not need probable cause to go the residence on April 11 or April 12. The police, in the course of a criminal investigation, may enter the curtilage

---

1. Counsel ran some risk of being considered on appeal to have waived objection to the evidence. The only sure way to avoid that risk is to either (1) have the judge specifically recite for the record that the objection is preserved throughout; or (2) respectfully demand a ruling on the pre-trial motion before trial; and then, throughout the trial, as necessary, reiterate the objection, so that the court may reconsider at each stage of the proceeding. The court does not have to take such a motion "with the case." If the court is not persuaded that the motion should be granted, the court can simply deny the motion subject to reconsideration later at trial when proper objection is made at trial.

around a home and knock on the door to seek admittance or to converse with the resident. *See Kriley*, 976 S.W.2d at 22. "[T]here is no reasonable expectation of privacy subject to Fourth Amendment protection where the public at large is welcome." *Id.*

Officer Daniel's suspicion that methamphetamine was being produced in Apel's residence at the time he asked for permission was based on more than an anonymous tip. During his second visit to the house, Daniel smelled an odor which he, based on experience and training, associated with methamphetamine production. Thus, the officer had reasonable suspicion that a crime was being committed at the time he contacted Apel in the driveway.

### Consent

Entry of a residence upon valid consent of a resident in charge of the home is lawful. *State v. Johnston*, 957 S.W.2d 734, 742 (Mo. banc 1997). Consent is valid only when it is freely and voluntarily given. *State v. Bunts*, 867 S.W.2d 277, 281 (Mo.App.1993). Consent is freely and voluntarily given if, in light of the totality of the circumstances, the objective observer would conclude that it was the result of a free and unconstrained choice. *State v. Hyland*, 840 S.W.2d 219, 221 (Mo. banc 1992).

Officer Daniel testified that he asked Apel if he could enter his residence to identify the occupants. Daniel said that although Apel hesitated briefly, he agreed to take him into the residence. Nothing in Daniel's testimony indicated that Apel's compliance was the result of a threat, coercion, or force. Daniel drew his gun as he was about to enter the residence, *after* consent had already been given. The drawing of the gun, under the circumstances, was not unreasonable. Entry of the house could have been perceived as a

significant safety risk in view of the apparent methamphetamine production in process.

Apel testified that he did not consent to Daniel's entry into the house. However, the court was free to choose which rendition of events to believe. *State v. Shaw*, 915 S.W.2d 775, 780 (Mo.App.1996). The notion that Apel voluntarily consented is not extremely improbable in light of the record as a whole. *Kriley*, 976 S.W.2d at 19. Viewing the evidence in a light favorable to the trial court's decision, we cannot say the trial court's ruling was implausible in the light of the record as a whole. We cannot say the trial court erred in determining that valid consent was voluntarily given.

### Probable Cause

Once inside the residence, Daniel was authorized, as he looked for the occupants, to observe any evidence in plain view. What an individual knowingly exposes to public view, even in his or her own home, involves no reasonable expectation of privacy and is not a subject of Fourth Amendment protection. *Kriley*, 976 S.W.2d at 19. The plain view doctrine allows an officer, who is lawfully located in a place, to seize any objects that can plainly be seen so long as there is probable cause that the object is connected to a crime. *State v. Johnston*, 957 S.W.2d 734, 742 (Mo. banc 1997).

Officer Daniel was, as determined by the trial court, lawfully in the home as a result of valid consent. The scope of this consent included authority to enter the house for the purpose of identifying occupants. Upon entering the house, Daniel saw two occupants, one in the living room and one in the kitchen. Daniel also saw a scanner and several radios in the living room. The tipster had warned the officer that the occupants of the house might have a scan-

ner on. The presence of the scanner was thus further corroboration. In the kitchen window, he saw a box fan that was blowing the noxious odor to the outside. The scanner, radios, box fan, and individuals were in plain view. The presence of the scanner and the odor were consistent with and confirmatory of the information gained from the tip.

■ Daniel had, as a result of these factors, an abundance of probable cause to believe that the residence housed a methamphetamine lab. "Probable cause exists where the apparently incriminating character of the item is obvious." *Johnston*, 957 S.W.2d at 742–43. The odor of anhydrous ammonia emanating from Apel's residence, the presence of the scanner, and the box fan were obviously indicators of a methamphetamine operation.

■ Although Daniel had already discovered two occupants, he had no knowledge whether anyone else was in the house at that time. Having probable cause to believe a crime was in progress, and not knowing who else might be in the house, a careful search of the rest of the house was reasonable. Also, Daniel said he asked again for consent to search the rest of the house. Apel complied. At this point, however, it is doubtful that Apel's consent was necessary. With a methamphetamine operation in effect, the officer was ready to begin to make arrests and, for the purposes of both safety and to interrupt a crime in progress, the officers were free to ascertain who else was in the house, and to determine whether they were estopped in the commission of a crime or might constitute a threat to the officer's safety.

While walking through the remainder of the first floor, Daniel saw a box of Heet in the kitchen. Daniel knew that Heet was typically used in the production of methamphetamine. Daniel also continued to smell the strong odor coming from a room in the back of the house. Apel opened the door to the room, and the strong odor burned Daniel's eyes, nose, and lungs. In plain view, Daniel observed a glass Mason jar containing a bubbling liquid. The strong odor and the presence of the jar indicated that an active methamphetamine operation had been interrupted in progress.

Apel argues that Officer Daniel never intended to look for occupants. He says that Daniel's statement to Apel about looking for a subject was "merely a pretext to gain entry . . . to conduct a more thorough search." Apel suggests that this "misrepresentation" is tantamount to coercion and, therefore, invalidates his alleged consent.

It is not at all clear that there was a misrepresentation. The officer's testimony is consistent with the notion that after he got out of his vehicle and approached Apel, he wanted to say that he was looking for particular person, but that he did not remember the name, although it was written on a pad in his vehicle. If that is true, then his statement that he was looking for a "subject" is not completely false. In any event, we fail to see how Officer Daniel's statement, even if it was a "misrepresentation," was such that it would transform Apel's consent into non-consent. In consenting to allow access to search for a particular subject, Apel inferentially authorized the officer to observe all items in plain view.

The facts of this case are easily distinguishable from those contained in the cases that Apel cites in support of his assertion. *See State v. Lorenzo*, 743 S.W.2d 529 (Mo.App.1987) (search of van and its contents went beyond the scope of consent to "peek" inside vehicle);[2] *Bump-*

---

**2.** This case also is no longer authoritative

because it was overruled by *State v. Martin*,

*er v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968) (consent invalid where officer misrepresented that he had a warrant to conduct the search). Here, Officer Daniel did not exceed the scope of the permission he was given. Also, the officer did not lie in an effort to cause the issuance of a warrant. It is not even clear that it would be fair to call the officer's statement a misrepresentation. Apel admits that the officer told him that he could not remember the name of the person he was looking for, but he had it written down on some paperwork in his car. Apel could have, but did not, insist that the officer retrieve the name in question.

The next question is whether the officer should have, after arresting the occupants, secured the premises, and then sought to obtain a warrant before conducting a further search of the premises. The answer is that would have been the most technically proper thing to do. It is obvious, however, that he would have had a duty to post officers on the premises to make sure no one obtained access to the dangerous chemicals in the interim. It is further obvious that a warrant would have issued. Moreover, even if it did not seem that there was an immediate risk of an explosion in connection with chemicals on the premises, as a general rule it is not a good idea to defer the investigation of the site of a chemical laboratory containing volatile chemicals. Thus, we conclude that the warrantless search of the house at that time was reasonable. *See State v. Row-*

land, 73 S.W.3d 818, 824–25 (Mo.App.2002) (strong smell of ether and incriminating items observed in plain view established probable cause to obtain a search warrant). Therefore, these items were properly admitted into evidence.

The touchstone of the Fourth Amendment is reasonableness. *Kriley,* 976 S.W.2d at 21. The police could have arrested the occupants and watched the house while a warrant was procured. But whether the police waited and formally obtained a warrant or not, they would have had to secure the house and preclude access. There was no practical difference to Apel whether or not a warrant was obtained.[3] Thus, it was not error for the trial court to admit the evidence obtained in the warrantless search.

The judgment is affirmed.

892 S.W.2d 348, 351 (Mo.App.1995).

**3.** In *State v. Rutter,* 93 S.W.3d 714 (Mo. banc 2002), the Court refused to employ the "inevitable discovery" doctrine where it appeared that the warrantless search had an effect of undermining a defendant's claim of self-defense. In that case, had the police gone to get a warrant before searching the residence, the defendant's self-defense argument would not

have been weakened because he could have maintained (without fear of strong rebuttal) that there were firearms in the victim's closet at the time of the shooting even though no firearms were later discovered when the officers searched. Here, it is clear that the officers would not have allowed anyone access to the premises because of the obvious danger, even if they had gone to procure a warrant.