**Jeff and Amy KEARBEY, Appellant–Respondents,**

v.

**WICHITA SOUTHEAST KANSAS, Respondent–Appellant.**

**Nos. WD 65170, WD 65207.**

Missouri Court of Appeals, Western District.

Nov. 6, 2007.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 18, 2007.

Scott S. Bethune, John M. Cusick, Co–Counsel, Kansas City, for Appellant–Respondent.

Bradley S. Russell, Overland Park, KS, for Respondent–Appellant.

Before LOWENSTEIN, P.J., ELLIS, and HARDWICK, JJ.

HAROLD L. LOWENSTEIN, Judge.

### FACTUAL BACKGROUND:

This case stems from an automobile collision in Shannon County, Missouri, in 2000. On the night of October 13th of that year, appellant Jeff Kearbey was driving an extended-cab pickup truck eastbound on U.S. Highway 60, returning to his home after picking up his step-daughter Cassie Foster. The distance between Kearbey's home in Ellsinore, Missouri, and Mountain View, Missouri, where Cassie was living was about sixty miles. Having left Ellsinore at seven or seven thirty in the evening, Kearbey returned that same night with Cassie and his son Jaykota as passengers. Cassie was sleeping in the front passenger seat of the truck and Jaykota was seated on a bench seat in the back, extended-cab portion of the vehicle. Evidence was introduced at trial that Kearbey was fatigued from a lack of adequate sleep and that he told Cassie they might have to play a game called "try and keep dad awake."

Also traveling on U.S. Highway 60 that night was semi-truck driver and Wichita Southeast Kansas Transit (WSKT) em-

ployee Mark Vail. Vail was driving a tractor-trailer rig westbound, pulling two trailers in tandem. At approximately 10:00 p.m., Vail's tractor-trailer and Kearbey's truck met on the highway and collided. There was conflicting testimony at trial over where the vehicles were located immediately prior to the collision, with some witnesses claiming that Kearbey's truck entered the westbound lane just before the vehicles impacted and others claiming that Vail's tractor-trailer crossed into the eastbound lane. Regardless, the resulting accident caused significant damage to the vehicles and injuries to Kearbey including broken ribs, a deep laceration of his left shoulder, and trauma to his lungs.

## THE TRIAL:

In July of 2002, Kearbey filed a suit for damages against Mark Vail and WSKT alleging negligence on the part of Vail with regard to the collision and vicarious liability on the part of WSKT. Amy Kearbey, Jeff Kearbey's wife, joined the suit with a loss of consortium claim. The case was heard by a jury in a two-week trial starting in October of 2004. At trial, each side attempted to prove that the accident was the result of the other's vehicle being partially in the wrong lane of traffic. Experts testified for each side and two police officers who responded to the scene of the accident were called and examined by the defendant with respect to the circumstances of the collision. The jury's verdict was for the defendants, finding Kearbey one-hundred percent at fault. Kearbey raises five points of error relating to jury instructions and evidentiary issues.

## POINT I: JURY INSTRUCTION NUMBER EIGHT

■ Kearbey asserts error in instruction number eight, specifically the portion which reads: "In your verdict you must access a percentage of fault to plaintiff Jeff Kearbey, whether or not defendant was partly at fault, if you believe: First, plaintiff's motor vehicle was on the wrong side of the road or plaintiff failed to keep a careful lookout." Kearbey claims that the instruction on failure to keep a careful lookout was not supported by substantial evidence.

■ When reviewing claimed instructional error, this court views the evidence most favorably to the instruction, disregards contrary evidence, and reverses where the party challenging the instruction shows that the instruction misdirected, misled, or confused the jury, and there is a substantial indication of prejudice. *Twin Chimneys Homeowners Ass'n v. J.E. Jones Constr. Co.*, 168 S.W.3d 488, 498 (Mo.App.2005). An appellant is entitled to a new trial only if the instructions contain " 'defects of substance with substantial potential for prejudicial effect.' " *Mal Spinrad of St. Louis, Inc. v. Karman, Inc.*, 690 S.W.2d 460, 463 (Mo.App.1985). Any instruction given to the jury must be supported by substantial evidence in the record. *Griffin v. Kansas City S. Ry. Co.*, 965 S.W.2d 458, 462 (Mo.App.1998). If an instruction is submitted in the disjunctive, "all submissions must be supported by substantial evidence." *Messina v. Prather*, 42 S.W.3d 753, 759 (Mo.App.2001). "Substantial evidence is competent evidence from which a trier of fact can reasonably decide the case." *Mathis v. Jones Store Co.*, 952 S.W.2d 360, 366 (Mo.App. 1997). In determining whether there is substantial evidence to support the instruction, this court views the evidence and all reasonable inferences therefrom from the standpoint most favorable to the party offering the instruction, here the defendant. *Corbin v. Wennerberg*, 459 S.W.2d 505, 507 (Mo.App.1970).

■ "[T]he alleged negligent failure to keep a careful lookout is not to be

submitted to the jury unless there is substantial evidence from which the jury could find that in the exercise of the highest degree of care, the allegedly negligent party, had he kept a careful lookout, could have seen the other vehicle in time thereafter to have taken precautionary action." *Hill v. Barton*, 579 S.W.2d 121, 128 (Mo. App.1979). Where failure to keep a careful lookout forms the basis of a comparative negligence defense, additional evidence is necessary from which the jury could find that plaintiff's failure to keep a careful lookout was a proximate cause of the collision. *See Heberer v. Duncan*, 449 S.W.2d 561, 563 (Mo. banc 1970). Merely looking does not fulfill one's duty to keep a careful lookout. *Hill*, 579 S.W.2d at 128. "A person is required to look in such an observant manner as to enable him to see what one in the exercise of the highest degree of care could and should have seen." *Id.* A failure to keep a lookout submission contains two inherent components, the ability to see and the ability, including time and means, to avoid the accident. *See Heberer*, 449 S.W.2d at 563. "Generally, it is impossible for a party to produce direct evidence that the other party was not looking." *Finninger v. Johnson*, 692 S.W.2d 390, 393 (Mo.App.1985). "Thus, proof can be made circumstantially." *Id.*

At trial, WSKT presented testimonial evidence by several persons that tended to show a failure by the plaintiff, Kearbey, to keep a careful lookout. As to Kearbey's ability to see the tractor-trailer before impact, WSKT introduced deposition testimony of Kearbey's son Jaykota that, after Jaykota noticed the headlights from Vail's tractor-trailer shining on the back seat of Kearbey's truck, Jaykota had time to turn and look out the front windshield and notice the location of Vail's tires with respect to the center line. It is evident from the record that Jaykota was sitting in the back

seat of the truck and directly behind his sister Cassie who was seated in the front passenger seat. So seated, the boy would have had to lean to the middle of the truck and look through the two front seats to see out the front windshield.

WSKT also produced several forms of evidence that tended to show Kearbey had fallen asleep at the time of the accident. The jury heard testimony from the highway patrol's Sergeant Inman, who had spoken with Cassie Foster during his investigation of the accident. According to Inman, Cassie said she had asked her father whether they could play a game in the car as they traveled that night and he responded that the only game they would be playing would be "try and keep dad awake." Evidence of Kearbey's fatigue was introduced through the testimony of Lashawn Loveall, Kearbey's sister-in-law. Loveall admitted that, to her knowledge, Kearbey had slept only six hours the night before the accident.

Along with this testimony as to the fatigued condition of Kearbey on the night of the accident, WSKT also presented evidence regarding the scene of the accident that the jury could have taken as proof that Kearbey had driven in the wrong lane and had done so because he had fallen asleep at the wheel. Mark Vail testified that Kearbey entered Vail's lane immediately before the accident and that Kearbey did not take any evasive action to prevent the collision. Sergeant Inman testified that the tire marks left by Vail's tractor-trailer were contained in the westbound lane in which Vail had been traveling. WSKT introduced pictures showing the same. Sergeant Inman also testified that there were no tire marks made by Kearbey's truck until after the point of impact. Dr. Bruno Schmidt, an accident reconstruction expert, testified that the collision occurred in Vail's lane of traffic. Dr.

Schmidt also read to the jury, from a manual on accident reconstruction, the following: "The best refutation of speculation that a driver fell asleep is some sign on the road or observed vehicle behavior indicating [that] before leaving the roadway or striking another vehicle, the driver applied brakes or steered abruptly. One does not do either of these if he is really asleep." When asked if there was any evidence on the road of brake application or abrupt steering by Kearbey, Dr. Schmidt stated that there was none. Also, Sergeant Inman testified that there were no tire marks left by Kearbey's truck until after the point of impact.

The evidence noted above is to be viewed in a light most favorable to WSKT, the proponent of the instruction. From the testimony of Jaykota, the jury could have found that Kearbey had the ability to see the approaching tractor-trailer and the time to react. Jaykota's account suggests that he had time, after noticing the reflection of the tractor-trailer's headlights on the seat next to him, to turn, lean over to the center of the truck, look out the windshield, and notice not only the tractor-trailer but the location of its tires with respect to the center line. A driver exercising the highest degree of care would have seen an approaching vehicle before a backseat passenger noticed the reflection of its headlights. The response time available to Kearbey would plainly be greater than that available to Jaykota. The jury had before it evidence in the form of Cassie's statement and Loveall's testimony that supports an inference that Kearbey was fatigued and was having trouble staying awake on the night of the accident. Further, testimony and pictures were introduced to show that no evasive maneuvers were taken and that Kearbey's truck was in the wrong lane at the point of impact, while Vail's tractor-trailer was in the correct lane. This evidence, combined with the statements of the accident reconstruction manual about sleeping drivers, constitutes substantial evidence from which a jury could reasonably have made a decision, based on jury instruction number eight, that Kearbey failed to keep a careful lookout and that this failure contributed to the collision. There was no error in submitting instruction eight to the jury.

 Even assuming that the instruction was given in error, Kearbey still would not have sustained his burden of showing prejudice as a result of the instruction. The party claiming instructional error has the task of showing " 'that the instruction as submitted misdirected, misled or confused the jury.' " *Martens v. White*, 195 S.W.3d 548, 557 (Mo.App.2006) (quoting *Hein v. Oriental Gardens, Inc.*, 988 S.W.2d 632, 634 (Mo.App.1999)). In his brief, Kearbey merely concludes that the instruction produced prejudicial error and substantially affected the jurors' deliberations without providing any argument as to why such a conclusion should be reached. Point I is denied.

### POINT II: CONCLUSIONS OF A LAW ENFORCEMENT OFFICER

 Kearbey's second assignment of error relates to certain questions directed to Sergeant Fisk, one of the officers who responded to the scene of the accident. On re-direct examination, WSKT's attorney asked Sergeant Fisk, "You were asked [on cross examination] about this issue of not noting the complete field of the liquid fuel or the liquid that was on the roadway and those kind of specifics.... Is one of the reasons that those things weren't noted because you did not feel that there was a significant question about what happened that night?" Sergeant Fisk responded, "That's correct." Defendants' attorney continued, "And in discussing this accident,

Trooper Inman expressed to you, he didn't have much question or doubt about what happened?" The trial court sustained a hearsay objection before Sergeant Fisk could answer the latter question. Kearbey claims that this exchange constitutes an implicit expression to the jury of the opinions of Sergeant Fisk and Sergeant Inman that Kearbey caused the collision by falling asleep at the wheel, and that such opinion evidence by an officer of the law is non-admissible and highly prejudicial. WSKT counters that Sergeant Fisk did not actually mention any conclusions in the challenged testimony and that the questions were allowable in response to Kearbey's attack on the "quality, length, and depth" of the investigation during his cross-examinations and depositions[1] of Sergeant Fisk and Sergeant Inman.

"Substantial deference is given [to] a decision of the trial court as to the admissibility of evidence, which will not be disturbed absent an abuse of discretion." *Kansas City v. Keene Corp.*, 855 S.W.2d 360, 367 (Mo. banc 1993). "The trial court will not be found to have abused its discretion unless its 'ruling was clearly against the logic of the circumstances, and so unreasonable and arbitrary that the ruling shocks the sense of justice and indicates a lack of careful, deliberate consideration.'" *Litton v. Kornbrust*, 85 S.W.3d 110, 113 (Mo.App.2002)(quoting *Brantley v. Sears Roebuck & Co.*, 959 S.W.2d 927, 929 (Mo. App. E.D. 1998)). "To reverse, [this court] must find that the trial court's error in excluding evidence was prejudicial and not harmless and that the error materially affected the merits of the action." *Romeo v. Jones*, 144 S.W.3d 324, 332 (Mo.App.2004). "A ruling within the trial court's discretion is presumed correct, and the appellant bears the burden of showing abuse of discretion and prejudice." *Id.*

"A determination of prejudice by the erroneous admission of evidence depends largely upon the facts and circumstances of the particular case." *Khan v. Gutsgell*, 55 S.W.3d 440, 443 (Mo.App. 2001). "The appropriate question then is whether the erroneously admitted evidence had any reasonable tendency to influence the verdict of the jury." *Id.* "Missouri courts have long recognized that juries are likely to give undue weight to an investigating officer's assessment of the relative degree of fault of the parties in a traffic accident." *Khan*, 55 S.W.3d at 443; *Chester v. Shockley*, 304 S.W.2d 831, 835 (Mo.1957). "[I]t is simply not an officer's duty or province to offer an opinion regarding civil liability." *Khan*, 55 S.W.3d at 443. Proper subjects for opinion by an officer with experience involving automobile accidents and accident reconstruction include items like the speed of the vehicles involved when such opinion is based upon the physical evidence observed at the scene of the accident. *Stucker v. Chitwood*, 841 S.W.2d 816, 820 (Mo.App.1992). However, in an automobile negligence case, an officer of the law may not state his opinion as to which party to an auto accident was at fault or which actions of the parties contributed to the accident. *Id.*

The types of opinions by police officers that must be excluded by the trial court are those that go to the officer's own assessment of who was responsible for an accident. *See Stucker*, 841 S.W.2d at 819–21; *Khan*, 55 S.W.3d at 441–44; *Wills v. Townes Cadillac–Oldsmobile, Inc.*, 490 S.W.2d 257, 262–63 (Mo.1973). In *Stucker*, defense counsel asked of a highway patrol officer, "Based on your investigation and based upon what you found out there [at the scene of the accident], did you find any

---

1. Portions of the videotaped depositions were played for the jury during trial.

contributing circumstances of [the plaintiff]?" *Stucker*, 841 S.W.2d at 817. The officer answered in the negative. *Id.* Defense counsel in *Khan* asked an officer if the defendant "did anything to contribute to this accident." *Khan*, 55 S.W.3d at 441. The officer then testified that, in her report, she had concluded that the defendant had not likely contributed to the accident. *Id.* at 442. Appellate courts in *Stucker* and *Khan* found error in the admission of such opinion testimony. *Stucker*, 841 S.W.2d at 821; *Khan*, 55 S.W.3d at 443–44. Finally, in *Wills*, the court found that the admission of testimony by an officer that no citation had been issued and no charges were filed amounted to inadmissible opinion evidence by an officer of the law that one party to the action was not at fault. *Wills*, 490 S.W.2d at 262–63.

In the case at bar, the question and response of Sergeant Fisk with respect to the reason for non-inclusion of specifics in the police report simply does not rise to the level of an opinion by a police officer as to which of the parties was at fault. The question here merely allowed Sergeant Fisk to state that he and Sergeant Inman decided not to pursue more extensive fact gathering to supplement their accident report because he believed the report already adequately described the occurrence. The most plausible implication of this testimony is that the accident was not unduly complicated and was plainly represented by the physical evidence noted in the report. It is unlikely that a reasonable juror would extrapolate the meaning of such a statement into an opinion that one party was solely at fault for the collision.

On cross-examination, plaintiff's counsel attacked the credibility of the police investigation through several questions designed to show incompleteness in the officers' accident report and fact gathering efforts. Plaintiff's counsel inquired about the absence in the accident report of any statement attributed to Cassie Foster, with the obvious purpose being to reduce the officers' credibility with regard to their testimony about her "keep daddy awake" statement. Inquiries were also made as to whether Sergeant Fisk had taken measurements or photographs, and whether an accident reconstruction had been performed by the officers. Also, in video-taped depositions played for the jury, defense counsel asked questions designed to emphasize the fact that the officers had not returned to the scene the following day, did not perform an accident reconstruction, did not take more specific measurements of the accident scene, and did not perform a commercial vehicle inspection. The trial court apparently decided that this attack on the completeness of the officers' investigation constituted impeachment and opened the door for defense counsel to bolster the officers' credibility with an explanation of why the accident report lacked certain specifics. It was for this purpose that the judge allowed Sergeant Fisk to affirm trial counsel's suggestion that Fisk had not deemed it necessary to include such specifics because he did not think there was a serious question about what had occurred that night. It cannot be said that this ruling was clearly against the logic of the circumstances or so unreasonable as to indicate a lack of careful consideration. The trial court did not abuse its discretion in allowing this evidence.

■ Furthermore, even assuming it was error to allow the challenged question and answer, the error would not have resulted in prejudice. Cases finding that the erroneous admission of officer opinions prejudiced a party focus on a few factors as showing prejudice. *See Wills*, 490 S.W.2d at 262–63; *Chester v. Shockley*, 304 S.W.2d 831, 835–36 (Mo.1957); *Khan*, 55

S.W.3d at 443; *Stucker*, 841 S.W.2d at 817–20. The most common appears to be the mention of the opinion in closing arguments. *See Wills*, 490 S.W.2d 257 at 262; *Khan*, 55 S.W.3d at 442; *Stucker*, 841 S.W.2d at 817–18. Others include the officer being the first witness at trial, the repeated reference to the opinion testimony throughout trial, and the officer's opinion being harmful to the party that called the officer as a witness. *See Chester*, 304 S.W.2d at 835–36. Here, the question was asked and answered in a brief moment on re-direct examination. Both officers were called by the defendant so neither was the first witness and neither provided testimony that turned against the party that called them. The contested question did not become the basis of further questioning. Defense counsel made no mention of the issue in his closing arguments. Point II is denied.

### POINT III: INCONSISTENT STATEMENTS REGARDING MARIJUANA USE

■ Kearbey objects to having been cross-examined with respect to statements in medical questionnaires regarding prior use, or lack thereof, of marijuana. He asserts error in the admission of this evidence in that the marijuana use had no relevance to the case at trial and the effect of the introduction of this evidence was prejudicial to the plaintiff's case. On cross-examination of Kearbey, defense counsel asked, "Mr. Kearbey, have you ever told one of your medical providers after this accident that you used drugs like marijuana before?" Kearbey responded that he did not recall but may have done so. At that point, defense counsel showed Kearbey a medical questionnaire, which represented that Kearbey had never used drugs. Kearbey did not admit to having filled out the questionnaire but claimed that it was in his wife's handwriting. Then, defense counsel showed Kearbey a

second questionnaire, on which Kearbey had indicated prior use of marijuana. In his closing statements, defense counsel reminded the jury of the two questionnaires and asked the jury to consider the evidence of inconsistency on the issue of Kearbey's credibility. WSKT had no right, Kearbey argues, to seek to prove inconsistencies in Kearbey's statements because his wife had filled out one of the two medical questionnaires used in his impeachment, and, thus, Kearbey had not made any inconsistent statements. WSKT argues that the statements, which it describes as "prior inconsistent statements," were introduced for the purpose of challenging credibility and were admissible for that purpose.

■ " '[T]he admissibility of evidence lies within the sound discretion of the trial court,' including the introduction of evidence for the purpose of impeachment." *Litton v. Kornbrust*, 85 S.W.3d 110, 113 (Mo.App.2002) (quoting *State v. Futo*, 932 S.W.2d 808, 819 (Mo.App. E.D. 1996)). As a general rule, on cross-examination, a witness may be asked any questions which tend to test his accuracy, veracity, or credibility, or to shake his credibility by injuring his character. *Sandy Ford Ranch, Inc. v. Dill*, 449 S.W.2d 1, 6 (Mo.1970). A witness "may be compelled to answer any such question, however irrelevant it may be to the facts in issue, and however disgraceful the answer may be to himself, except where the answer might expose him to a criminal charge." *Id.* "The law is well settled in this state that the admissibility of specific acts tending to impeach or disparage the testimony of a witness is largely within the discretion of the trial court." *Arnold v. Alton R.R. Co.*, 348 Mo. 516, 154 S.W.2d 58, 60 (1941). "In the discretion of the trial court, a witness may, for the purpose of impeachment, be

asked whether he has committed particular wrongful ... acts, subject to his right to refuse to answer incriminating questions, even though such facts or acts may be collateral to the principle controversy." *Id.*

In *State v. Williams,* a witness was asked whether she made a false police report and whether she had lied to the police about a shooting. 492 S.W.2d 1, 3–6 (Mo.App.1973). In finding the questioning to be proper, the court stated, "The questions therefore concerned a specific instance about which Mrs. Jones may have lied or made a false report. This goes directly to her veracity. If she cannot be trusted to make a truthful report to authorities, the jury may reasonably infer that she cannot be trusted on the witness stand." *Id.* at 6.

Clearly, the question of whether Kearbey made inconsistent representations in doctor's questionnaires is one that goes to his credibility as a witness. As *State v. Williams* suggests, the jury could infer that a person who is not consistently truthful in statements made to other persons might also be untruthful in his testimony on the witness stand. Assuming that inconsistent statements were made by Kearbey regarding his past use of marijuana, the two statements together are evidence of a prior bad act that tends to show a lack of veracity. This is so because admitting that two statements of this nature exist is essentially admitting to deceit in the production of one statement or the other. Such an attack is relevant to witness credibility and is within the permissible scope of cross-examination. The fact that marijuana use was the underlying topic of disclosure in the questionnaires and such use itself was irrelevant to the issues at trial is immaterial.

Contrary to Kearbey's arguments, evidence of the two questionnaires would be relevant to prove a lack of veracity, even though Kearbey denied actually writing the questionnaire denying drug use. The fact is that defense counsel was able to bring out, through the testimony of the plaintiff, evidence that inconsistent representations had been made as to his medical history. Since such representations as are contained in medical questionnaires would reasonably be thought of as the statements of the patient, an inconsistency between them tends to show deceit on the part of the patient. Kearbey's efforts to explain away the existence of such an inconsistency may reduce the weight of the evidence with respect to his credibility, but the inconsistency is still probative of a lack of veracity. Point III is denied.

## POINT IV: IMPEACHMENT BY STATEMENTS TO APPELLANT'S INSURER

■ Kearbey's next point of error challenges the use by defense counsel of a transcript of a recorded statement, taken by an insurance adjuster for the company insuring Kearbey's truck, to impeach his testimony by prior inconsistent statement. Kearbey argues both that defense counsel failed to lay a proper foundation for the evidence and that it was protected by the insurer-insured privilege. Although Kearbey claims in his brief that the evidence was admitted "over objection," the record reveals no objection during the cross-examination of Kearbey to the use of the transcript, either on the basis of foundation or privilege. Plaintiff's counsel did not raise the argument of privilege until a later point when defense counsel sought to play the actual recording to the jury. Due to the failure to object to the use of the transcript on cross-examination at trial, any error that may have existed was not properly preserved for appellate review. *See State v. Apel,* 156 S.W.3d 461, 465 (Mo.App.2005).

Because this issue was not properly preserved, review by this court is limited to plain error. *Day Adver., Inc. v. Devries & Assoc., P.C.,* 217 S.W.3d 362, 365 (Mo.App.2007). "Plain error affecting substantial rights may be considered on appeal, at this court's discretion, even when not raised or preserved, when [the court] find[s] that manifest injustice or a miscarriage of justice has resulted." *Id.* (quoting *Guess v. Escobar,* 26 S.W.3d 235, 241 (Mo.App.W.D.2000)). "Plain error is found only where the alleged error establishes substantial grounds for believing a manifest injustice or miscarriage of justice occurred." *Hensley v. Jackson County,* 227 S.W.3d 491, 497 (Mo. banc 2007). Under Rule 84.13(c), plain error review involves a two-step process. *Day Adver.,* 217 S.W.3d at 365. First, the court must determine whether the claimed error facially establishes substantial grounds for believing that a manifest injustice or miscarriage of justice has resulted. *Id.* In other words, the court must decide whether, on the face of the claim, plain error has, in fact, occurred. *Id.* Errors are plain if they are evident, obvious, and clear. *Id.* In the absence of such error, the court should decline to exercise its discretion to review the claimed error under Rule 84.13(c). *Id.* If plain error is found on the face of the claim, the court may proceed, at its discretion, to the second step to consider whether a miscarriage of justice or manifest injustice will occur if the error is left uncorrected. *Id.*

With respect to the failure to lay a proper foundation for impeachment evidence, Kearbey argues that, since he denied making the recorded statement to his insurance company, he should not have been subject to further questioning relating to the statement. The foundation for a prior inconsistent statement is an inquiry of the witness regarding, first, whether the witness made the statement and, second, whether the statement is true. *State v. Wolfe,* 13 S.W.3d 248, 261 (Mo. banc 2000). If the witness claims to not remember if a prior statement was or was not made, a proper foundation has been laid to admit the prior inconsistent statement. *State v. Jones,* 652 S.W.2d 880, 882 (Mo.App.1983). In one of his first questions to Kearbey on the subject, defense counsel asked, "Now, you'd agree . . ., Mr. Kearbey, that you accurately described in a recorded statement on November 6th, 2000, the nature of your injuries, correct?" This question covered both the existence and truth of the prior statement. Mr. Kearbey's claim that he could not remember having made the statement completed the requirements for a proper foundation.

Kearbey also asserts error in that the trial court allowed defense counsel to ask questions regarding the recorded statement without introducing it into evidence. The proper procedure for using a prior inconsistent statement to impeach a witness involves reading the impeaching questions and answers and asking the witness if he so previously testified. *State v. Douglas,* 132 S.W.3d 251, 257 (Mo.App. 2004). This is exactly the course defense counsel took in his impeachment of Kearbey. Although he could have sought to admit the recorded statement or transcript thereof as extrinsic evidence after the foundation was laid (*Litton v. Kornbrust,* 85 S.W.3d 110, 113–14 (Mo.App.2002)), defense counsel chose not to do so. This does not constitute error on the part of the trial court.

Finally, Kearbey claims that the trial court erred in allowing the use of the content of the recorded statement as impeachment because the statement was subject to the insurer-insured privilege. He argues that the statement, as one given to an insurer with respect to an accident

covered by a policy with the insurer, is privileged under the Supreme Court of Missouri's decision in *State ex rel. Cain v. Barker*, 540 S.W.2d 50 (Mo. banc 1976). However, this court will only consider errors under plain error review if such errors are "evident, obvious, and clear." *Day Adver., Inc. v. Devries & Assoc., P.C.*, 217 S.W.3d 362, 365 (Mo.App.2007). The decision in *Cain v. Barker* was not completely analogous to the case at bar. In *Cain*, the Court adopted the doctrine of insurer-insured privilege, under which statements of an insured to his liability insurer are privileged if the insurer is required by contract to defend the insured and the communication was intended for the information or assistance of the insurer's attorney in the defense. *See Cain*, 540 S.W.2d at 54. However, *Cain* involved a defendant's claim of privilege against a plaintiff who sought to discover a statement given to an insurer, whereas here Kearbey, as the plaintiff, sought to invoke privilege to keep his statement from the defendant. *See Cain*, 540 S.W.2d at 51–52. In *Brantley v. Sears Roebuck & Co.*, this court found that the insurer-insured privilege did not extend to relationships insuring casualty losses because such relationships were fundamentally different from those that would justify the privilege. 959 S.W.2d 927, 928 (Mo.App.1998). *Brantley* noted that the liability insurer obligated to defend had identity of interest with an insured defendant, whereas the relationship between a casualty loss insurer and its insured is adversarial until the insurer acknowledges coverage under its policy. *Id.* Against this background, it is unclear whether the insurer-insured privilege applies to protect statements made by an individual insured for both liability and casualty, where that insured is the plaintiff rather than the defendant at trial. Since this issue is far from evident, obvious, or clear, this court cannot find plain error in the trial court's decision. Point IV is denied.

### ISSUE 5: CUMULATIVE ERROR

Kearbey's last point of error is that a new trial should have been granted by the trial court on the basis of cumulative error that amounted to prejudice. Since no error has been found to have been committed by the trial court, there is no basis to reverse for cumulative error. Point V is denied.

The judgment of the circuit court is *affirmed.*

All concur.