Cynthia L. Martin, Judge
Time Warner Cable Midwest, LLC ("TWC") appeals from a judgment awarding property damages to JJ's Bar and Grill, Inc. d/b/a JJ's Restaurant ("JJ's Restaurant") and JJ's Building, LLC ("JJ's Building"). TWC alleges error in the use of three verdict directing instructions and in the admission of expert testimony. JJ's Restaurant and JJ's Building cross-appeal alleging error in the reduction of their judgments by the amount of earlier settlements payments.
Finding no reversible error, we affirm.
Factual and Procedural Background[1]
TWC is a video services provider authorized to install fiber optic cable in public rights-of-way by the Missouri Public Service Commission ("PSC"). In early 2013, TWC undertook to install underground fiber optic cable to service the Plaza Vista project at 900 W. 48th Place on the west side of the Country Club Plaza (the "Polsinelli Offices").
JJ's Restaurant operated a restaurant ("JJ's") in a building owned by JJ's Building. JJ's was located on the north side of 48th Street, across the street from the Polsinelli Offices. TWC's fiber optic cable was to be installed running south under an alley on the east side of JJ's and then under 48th Street.
TWC entered into an agreement with Heartland Midwest, LLC ("Heartland") to install the underground fiber optic cable. TWC was aware that Heartland intended to use a trenchless technology known as horizontal directional drilling ("HDD") to install the fiber optic cable. HDD technology utilizes a drill to bore a hole underground through which utilities can be pulled, without excavating the surface.
Heartland notified Missouri One Call[2] of its intent to install the underground cable. USIC, a utility locating service, marked *855 buried utilities near the location of the planned installation, including those of Missouri Gas Energy ("MGE"), Kansas City Power & Light ("KCP&L"), and the City of Kansas City streetlights. USIC uses color-coded lines of paint to mark underground utilities. USIC placed a single yellow line (signifying an underground natural gas line) and a single red line (signifying an underground electric line) on the paved surface near the intersection of the alley on the east side of JJ's and 48th Street.
Heartland dug a pothole where the painted locator lines were placed. At a depth of approximately 22-24 inches, Heartland found two adjacent black conduits. Heartland concluded that one of the black conduits was the located electric line, and that the other was the located gas line.
Heartland then began drilling to install TWC's fiber optic cable. Heartland sat its drill to bore at a depth of approximately 37 inches. Heartland did not dig the pothole to the depth of the anticipated bore path. Heartland thus did not observe the bore head cross under the two black conduits exposed by its pothole. As Heartland bored beneath the two black conduits, the boring drill struck a 2 inch high pressure natural gas line owned by MGE.
The damage to the gas line caused natural gas to escape. Natural gas migrated under the asphalt alley and into JJ's, where it accumulated, ignited, and exploded. One JJ's employee was killed. Several persons were injured. JJ's and the building it occupied were destroyed.
On May 3, 2013, JJ's Restaurant and JJ's Building filed suit against MGE, USIC, Heartland, and TWC. JJ's Restaurant and JJ's Building subsequently settled with MGE and Heartland. On July 15, 2015, JJ's Restaurant and JJ's Building filed a second amended petition against TWC and USIC. The claims asserted against TWC were for negligence involving an inherently dangerous activity; negligence involving work that is dangerous in the absence of special precautions; negligence involving work performed in a public place; and negligence per se.
Following a six week trial, JJ's Restaurant and JJ's Building tendered proposed verdict directors for their claims against TWC for negligence involving an inherently dangerous activity requiring special precautions (Instruction No. 5); for negligence involving work performed in a public place (Instruction No. 6); and for negligence per se (Instruction No. 7). The verdict directors were submitted to the jury over TWC's objections, as discussed in greater detail, infra.
The jury returned a verdict on August 27, 2015 assigning 98% fault to TWC, 0% fault to USIC, and 2% fault to JJ's Restaurant. The jury awarded compensatory damages to JJ's Restaurant in the amount of $3,500,000, and to JJ's Building in the amount of $2,400,000. After applying the comparative fault allocation, the trial court entered judgment on September 9, 2015 in favor of JJ's Restaurant in the amount of $3,430,000, and in favor of JJ's Building in the amount of $2,352,000.[3] The judgment was entered "subject to offsets or credits that this court deems appropriate pursuant to any and all post-trial motions."
*856 On September 16, 2015, TWC filed a motion to amend the judgment pursuant to section 537.060[4] to reflect reductions for settlements reached with MGE and Heartland. On October 9, 2015, TWC also filed a motion for judgment notwithstanding the verdict, or in the alternative for new trial, which was never ruled on by the trial court. Over JJ's Restaurant and JJ's Building's objections, the trial court granted TWC's motion to amend the judgment, in part, to reflect reduction for settlement payments made by MGE and Heartland to JJ's Restaurant and JJ's Building. The trial court denied the motion to amend to the extent it sought reduction for a settlement payment made to Jimmy Frantze. The trial court entered an amended judgment on November 17, 2015, reducing the damages awarded to JJ's Restaurant to the amount of $1,492,000, and to JJ's Building to the amount of $1,514,000 ("Judgment").
On November 30, 2015, TWC filed a second motion to amend the judgment that was never ruled on by the trial court. TWC filed a notice of appeal on January 15, 2016, and a second notice of appeal on March 17, 2016. JJ's Restaurant and JJ's Building filed a notice of cross-appeal on January 20, 2016, and a second notice of cross-appeal on March 18, 2016.
Analysis
TWC raises four points on appeal. Points One, Two and Three claim error in the submission of Instructions 5, 6, and 7, the verdict directors for negligence involving an inherently dangerous activity requiring special precautions, for negligence involving work performed in a public place, and for negligence per se. Point Four claims error in denying TWC's motion to strike JJ's Restaurant and JJ's Building's expert witness because the expert intended to testify about legal conclusions and legal duties.
JJ's Restaurant and JJ's Building assert a single point in their cross-appeal. They claim error in the reduction of judgments entered in their favor by settlement payments made to them by MGE and Heartland because the settlement payments were disputed, requiring TWC to prove the affirmative defense of reduction before the jury was discharged.
Points One, Two and Three
TWC's first, second, and third points on appeal challenge verdict directors. "Whether a jury was properly instructed is a question of law that this Court reviews de novo. " Edgerton v. Morrison , 280 S.W.3d 62, 65 (Mo. banc 2009) (citation omitted).
The trial court did not err in submitting Instruction No. 5, the verdict director for negligence in the performance of inherently dangerous work without taking special precautions (Point One)
TWC complains that Instruction No. 5, the verdict director for negligence based on an inherently dangerous activity, was legally erroneous because (i) there was no substantial evidence that HDD work is inherently dangerous, and (ii) the instruction failed to comply with MAI 31.15 as the allegations in Paragraph Second were not "special precautions."
(i) Substantial evidence supported finding that HDD trenching is an inherently dangerous activity *857 TWC first complains that substantial evidence failed to establish that HDD trenching is an inherently dangerous activity. Relevant to this complaint, Paragraph First of Instruction No. 5 provided:
In your verdict, you must assess a percentage of fault to defendant Time Warner Cable Midwest, LLC, whether or not plaintiff JJ's Bar & Grill, Inc. d/b/a JJ's Restaurant was partly at fault, if you believe:
First, performing horizontal directional drilling in the Country Club Plaza was an inherently dangerous activity because it was a congested urban area with multiple utilities and hard surfaces, and....
Finding HDD to be an inherently dangerous activity was an essential predicate to TWC's vicarious liability for Heartland's negligence. "Persons are usually held liable for negligence on the part of those they hire to accomplish their purposes." Ballinger v. Gascosage Elec. Co-op. , 788 S.W.2d 506, 511 (Mo. banc 1990) (overruled on unrelated grounds by Zueck v. Oppenheimer Gateway Properties, Inc. , 809 S.W.2d 384 (Mo. banc 1991) ). There is an exception to this general rule "for the hiring of independent contractors responsible to the employer for the result bargained for, but not subject to control as to the means of accomplishment." Id. The independent contractor exception to vicarious employer liability does not apply, however, "if the work [an independent contractor is] contracted for is an 'inherently dangerous activity.' " Id.
For activities of this kind the owner [employer] remains liable for the torts of the contractor, simply for commissioning the activity. The liability attaches without any need for showing that the employer is in any respect negligent. It is purely vicarious.
Id. It is uncontested that Heartland was TWC's independent contractor. Thus, TWC was not vicariously liable at common law for Heartland's negligence unless the work Heartland was contracted to perform involved an inherently dangerous activity.
"[T]he determination of whether an activity is inherently dangerous, while initially a question of law, is ultimately a question of fact." Hatch v. V.P. Fair Foundation, Inc. , 990 S.W.2d 126, 134 (Mo. App. E.D. 1999). "To initially determine whether an activity is inherently dangerous ... the trial judge should begin by ascertaining the nature of the activity and the manner in which the activity is ordinarily performed." Id. at 136 (internal citation omitted). "If after considering these factors the trial court concludes the activity does not involve some peculiar risk of harm, then the activity is not inherently dangerous as a matter of law." Id. "If the trial court does not so find, then the question should be submitted to the jury pursuant to MAI 16.08."[5] Id.
TWC objected to submission of Instruction No. 5 during the jury instruction conference, arguing that the use of HDD technology in the Country Club Plaza was not *858 an inherently dangerous activity as a matter of law. The trial court denied TWC's objection, and thus concluded that sufficient evidence permitted submission of the issue to the jury. On appeal, TWC claims this was error because no substantial evidence supported a conclusion that HDD work is inherently dangerous.
"Any instruction given to the jury must be supported by substantial evidence in the record." Kearbey v. Wichita Southeast Kansas , 240 S.W.3d 175, 180 (Mo. App. W.D. 2007). " 'Substantial evidence is competent evidence from which a trier of fact can reasonably decide the case.' " Id. (quoting Mathis v. Jones Store Co. , 952 S.W.2d 360, 366 (Mo. App. W.D. 1997) ). "In determining whether there is substantial evidence to support the instruction, this court views the evidence and all reasonable inferences therefrom from the standpoint most favorable to the party offering the instruction." Id. To prevail on a no substantial evidence challenge, TWC must demonstrate that no evidence in the record tends to prove that HDD underground boring presents a substantial risk of harm unless adequate precautions are taken. See Ivie v. Smith , 439 S.W.3d 189, 200 (Mo. banc 2014) (explaining the no substantial-evidence challenge). TWC cannot sustain this burden.
MAI 16.08 defines "inherently dangerous activity" as:
[A]n activity that necessarily presents a substantial risk of harm unless adequate precautions are taken. [, but does not include a risk of harm that is not inherent in or a normal part of the work to be performed and that is negligently created solely as a result of the improper manner in which the work under the contract was performed.][6]
The evidence established that HDD trenchless technology is a less intrusive means of burying underground cables, as the technology avoids open trenches and street cuts. As a result, however, HDD trenchless technology involves "blind drilling," as a drill bores underground to create an unexposed path through which cable can be pulled. By its nature, HDD trenchless technology thus carries with it the inherent risk that the drill bore will encounter a buried object that cannot be seen. It is not the improper manner of doing HDD work which creates this risk. Rather, it is the work itself, normally performed, which creates this risk. The risk exists unless adequate precautions are taken to insure that pre-existing utility lines and cables are located and avoided by the drill bore.
Based on the evidence, this risk is heightened when HDD work is performed in an urban area. There is an increased prevalence of underground utilities and cables in urban areas. And when HDD work is performed in an area covered by a hard surface (such as asphalt or concrete), escaping gas has nowhere to disperse should a natural gas line be struck, causing gas to migrate along the underground line and into buildings serviced by the line.
TWC counters that "the mere performance of HDD in and of itself does not inevitably lead to harm or injury in the absence of 'special precautions.' " [TWC's Brief, p. 23] TWC argues that "even if a *859 contractor fails to take the routine precaution of having utilities marked before performing HDD, hitting a facility is not certain, and some utilities that could be hit present no immediate danger at all, such as sewer, water or a fiber optic cable." [TWC's Brief, p. 23-24] This argument is unpersuasive for two reasons.
First, it is irrelevant that HDD technology can be performed without encountering an underground utility even in the absence of special precautions. "The essence of inherent danger ... is the need for special precaution. It is not sufficient for [a] defendant to show that the work can be done safely." Ballinger , 788 S.W.2d at 509. TWC's argument underscores, in fact, that the risk of encountering underground utilities is inherent to HDD technology, and is not a risk created by negligence performance of the work, and is a risk that cannot be avoided unless adequate precautions are taken. Hatch , 990 S.W.2d at 137 (holding that trial court properly instructed jury to determine whether bungee jumping is inherently dangerous because a "risk of injury from a fall is a risk that inheres in bungee jumping itself in the absence of adequate precautions and ... the risk was not negligently created solely as a result of the improper manner [of performing] the work").
Second, TWC's argument improperly suggests that because an accidental encounter with underground utilities is only rarely catastrophic, HDD work is not inherently dangerous. The severity of potential harm is not relevant to determining whether an activity is inherently dangerous. The Restatement (Second) of Torts sec. 427 cmt. b (1965)[7] provides:
It is not ... necessary to the employer's liability that the work be of a kind which cannot be done without a risk of harm to others, or that it be of a kind which involves a high degree of risk of such harm, or that the risk be one of very serious harm, such as death or serious bodily injury.... It is sufficient that work of any kind involves a risk, recognizable in advance, of physical harm to others which is inherent in the work itself, or normally to be expected in the ordinary course of the usual or prescribed way of doing it, or that the employer has special reason to contemplate such a risk under the particular circumstances under which the work is to be done.[8]
The trial court did not err in submitting for the jury's determination whether HDD
*860 work in a congested urban area is an inherently dangerous activity.
(ii) The disjunctive submissions in Paragraph Second of Instruction No. 5 were authorized by MAI 31.15
TWC next complains that the disjunctive submissions in Paragraph Second of Instruction No. 5 were not special precautions as required by MAI 31.15, and were instead allegations of collateral negligence in the performance of the work "dressed up as special precautions." [TWC's Brief, p. 27]
Heartland's negligence was disjunctively submitted by Paragraph Second of Instruction No. 5:
Second, while conducting its horizontal directional drilling, Heartland Midwest either:
i. failed to determine the horizontal and vertical location of the 2 ' polyethylene MGE gas main running under the sidewalk on the north side of 48th Street before engaging in directional drilling in close proximity to that line; or
ii. failed to recognize that neither of the two black plastic conduits uncovered and observed by the Heartland Midwest drilling crew at approximately a 24' depth was a gas main; or
iii. failed to contact MGE or USIC to have them inspect the two black plastic conduits to determine whether or not one was the gas main; or
iv. failed to dig below the depth of the planned bore path in order to visualize the bore head as it safely passed through the location of the underground facilities; or
v. failed to maintain a minimum vertical separation of three feet from other facilities that existed in the right-of-way, including the MGE gas main; or
vi. failed to immediately notify MGE, 911, or the One Call Notification Center that it had struck the MGE gas main with its boring device; and
Third, Heartland Midwest, in one or more of the respects submitted in Paragraph Second, was thereby negligent[.]
TWC does not argue that these disjunctive submissions were unsupported by substantial evidence. TWC argues only that these contentions of negligence exceed those for which it could be vicariously liable because they did not each involve the failure to take a "special precaution." TWC's argument reflects a fundamental misapprehension of the law.
If it is established that the work of an independent contractor involves an inherently dangerous activity, then the employer "remains liable for the torts of the contractor." Ballinger , 788 S.W.2d at 511. The employer's "liability attaches without any need for showing that the employer is in any respect negligent." Id.
"[A] person who engages a contractor to do work of an inherently dangerous character remains subject to an absolute, nondelegable duty to see that it is performed with that degree of care which is appropriate to the circumstances, or in other words, to see that all *861 reasonable precautions shall be taken during its performance, to the end that third persons may be effectually protected against injury."
Hatch , 990 S.W.2d at 134-35 (quoting 41 Am.Jur.2d Independent Contractors sec. 41 (1968) ).
However, an employer "who hires an independent contractor to perform an inherently dangerous activity ... is not vicariously liable for every act of [the] independent contractor that causes injury to a third party." Id. at 135. "[I]f the contractor's negligence is 'collateral,' the general rule of landowner non-liability [for the work of an independent contractor] applies." Id. (citing Nance v. Leritz , 785 S.W.2d 790, 793 (Mo. App. E.D. 1990) ; Restatement (Second) of Torts sec. 426 cmt. a (1965)). "The Restatement defines collateral negligence as 'negligence which is unusual or abnormal, or foreign to the normal or contemplated risks of doing the work, as distinguished from negligence which creates only the normal or contemplated risk.' " Id. (quoting Restatement (Second) of Torts sec. 426 cmt. a (1965)). "[T]he proper focus for the factfinder is whether the landowner contemplated or should have contemplated the type of negligence committed by the independent contractor." Id. at 136 (citing Nance , 785 S.W.2d at 793 ; Restatement (Second) of Torts sec. 426 cmt. b (1965)).
The inquiry, therefore, is not (as TWC suggests) whether the acts or omissions alleged in the disjunctive in Paragraph Second each involved the failure to take a "special precaution." The inquiry is whether the acts or omissions alleged in the disjunctive in Paragraph Second were unusual or foreign to the normal contemplated risks of performing an inherently dangerous activity-in this case, HDD work. We conclude they were not. The disjunctive submissions in Paragraph Second each involved normal, contemplated risks of performing HDD work: failing to assess the presence of underground utility lines or cables; failing to avoid underground utility lines or cables; and failing to take action to avoid injury to others if an underground utility line or cable was encountered by the boring drill.
Our conclusion is consistent with the Restatement's guidance as to what an employer is and is not expected to contemplate:
"[A]n employer may hire a contractor to make an excavation, reasonably expecting that the contractor will proceed in the normal and usual manner with bulldozer or with pick and shovel. When the contractor, for his own reasons, decides to use blasting instead, and the blasting is done in a negligent manner, so that it injures the plaintiff, such negligence is "collateral" to the contemplated risk, and the employer is not liable. If, on the other hand, the blasting is provided for or contemplated by the contract, the negligence in the course of the operation is within the risk contemplated, and the employer is responsible for it."
Hatch , 990 S.W.2d at 136 (quoting Restatement (Second) of Torts sec. 426 cmt. b (1965)). Analogously, TWC knew that Heartland would be using HDD trenchless technology to install TWC's underground fiber optic cable. The risk of encountering pre-existing underground utility lines or cables unless adequate precautions are taken is a contemplated risk of HDD trenchless technology. The disjunctive submissions in Paragraph Second of Instruction No. 5 each involve alleged negligence in the course of performing the HDD work within the risk contemplated-that blind *862 boring may encounter an underground utility or cable. The disjunctive submissions in Paragraph Second were not allegations of "collateral" negligence.
MAI 31.15, the model instruction for submitting vicarious liability for an independent contractor's negligent performance of an inherently dangerous activity, is consistent with this conclusion. Paragraph Second of MAI 31.15 provides:
Second, during such activity, (state the name of independent contractor ) either :
failed to (here state the special precaution the independent contractor failed to take ), or
failed to (here insert alternative failure ), ....
(Emphasis in bold added.) Certainly, MAI 31.15 anticipates that an independent contractor's failure to take a special precaution is a submissible act of negligence in an inherently dangerous activity case. However, MAI 31.15 anticipates that other acts of negligence can also be submitted. The improper imposition of vicarious liability on an employer for "collateral" negligence is avoided by the collective operation of Paragraphs, Second, Third and Fourth of MAI 31.15, which require, respectively, that in one or more of the respects submitted in Paragraph Second, the independent contractor was negligent (Paragraph Third), and that "such negligence and the danger inherent in such activity combined to directly cause damage to plaintiff" (Paragraph Fourth). (Emphasis added). MAI 31.15 thus requires that the harm for which recovery is sought " 'results from the negligence of the contractor in failing to take precautions against the danger involved in the work itself, which the employer should contemplate at the time of the contract.' " Hatch , 990 S.W.2d at 135 (quoting Restatement (Second) of Torts sec. 427 cmt. d (1965)); see also Syn, Inc. v. Beebe , 200 S.W.3d 122, 129-30 (Mo. App. W.D. 2006) (holding that the nature of the inherently dangerous activity for which the independent contractor was hired must be tied to the resulting damage, and that MAI 31.15 "provides a series of findings with the requisite legal connections to [properly] hold a[n] [employer] responsible for the negligence of an independent contractor"). Though the harm for which recovery is sought must naturally follow from the failure to take adequate precautions, it does not follow that the only acts of negligence which will support vicarious liability are those which strictly involve the taking of a special precaution.
TWC's reliance on Hofstetter v. Union Electric Company , 724 S.W.2d 527 (Mo. App. E.D. 1987) for the proposition that anything other than the failure to take a special precaution constitutes collateral negligence is misplaced. In Hofstetter the issue was whether the inherently dangerous activity exception applied at all. Id. at 529-31. In connection with that inquiry, the court held a worker's "injury resulted from the common risk of not providing steps ... rather than from some special hazard intrinsic to the work itself." Id. at 531. The court found that the worker "was injured because [another employee] did not follow the rudimentary safety standards which Union Electric reasonably could expect to be carried out with proper care." Id. As a result, the court found that the worker's cause of action did "not fall within the inherent danger exception." Id. Hofstetter holds only that an independent contractor's "ordinary negligence" in performing work is insufficient to render the work an *863 inherently dangerous activity.[9] Hofstetter did not address the scope of an employer's vicariously liable once an independent contractor's work is determined to be inherently dangerous.
We similarly distinguish TWC's reliance on Bowles v. Weld Tire & Wheel, Inc. , 41 S.W.3d 18 (Mo. App. W.D. 2001) for the proposition that TWC cannot be vicariously responsible for Heartland's negligence in the performance of the operative details of its work. TWC again conflates whether the inherently dangerous activity exception applies with the scope of vicarious liability once the exception is deemed to apply. Bowles confirms, in fact, that once it is determined that an independent contractor's work is inherently dangerous, the employer is vicariously liable for the independent contractor's negligent performance of its work unless the negligence is "collateral." Id. at 23-24. As we held in Bowles :
Under the theory of collateral negligence, [an employer] "is not required to contemplate or anticipate abnormal or unusual kinds of negligence on the part of the contractor, or negligence in the performance of operative details of the work which ordinarily may be expected to be carried out with proper care, unless the circumstances under which the work is done give him warning of some special risk to take precautions, or some special risk of harm to others inherent in the work ."
Id. at 24 (quoting Restatement (Second) of Torts sec. 426 cmt. b (1965) (emphasis added)). That same provision of the Restatement also states that "[t]he employer is required to contemplate, and to be responsible for, the negligence of the contractor with respect to all risks which are inherent in the normal and usual manner of doing the work under the particular circumstances." Restatement (Second) of Torts sec. 426 cmt. b (1965). Thus, "[t]he test is whether the independent contractor's acts were or should have been within the contemplation of the [employer]." Bowles , 41 S.W.3d at 24 (citing Hatch , 990 S.W.2d at 136 ).
The disjunctive submissions in Paragraph Second of Instruction No. 5 satisfy this standard, and were appropriate submissions pursuant to MAI 31.15.
Point One is denied.
The trial court did not plainly err in submitting Instruction No. 6, the verdict director for negligence in the performance of work in a public place (Point Two)
TWC complains in its second point on appeal that Instruction No. 6, the verdict director for performance of work in a public place, was erroneous because Missouri has not adopted the Restatement (Second) of Torts section 417 or the Restatement (Third) of Torts section 64(b) or otherwise recognized a 'public place' exception to the rule that an employer is not vicariously liable for damages caused by the negligence of an independent contractor. TWC thus complains that Instruction No. 6 submits a theory of vicarious liability *864 for the negligence of independent contractors that has not been recognized in Missouri.
TWC's objection to Instruction No. 6 is not preserved for our review. "Proper preservation of error requires that objections be made at the instruction conference and renewed in a motion for new trial." Syn, Inc. , 200 S.W.3d at 135 (citing Hatch , 990 S.W.2d at 140 ). TWC acknowledges in its Brief that the only objection it registered to Instruction No. 6 during the instruction conference was that "there [is] no MAI for a public place cause of action." [TWC's Brief, p. 32] The only objection TWC registered to Instruction No. 6 in its motion for new trial was that the instruction "failed to track all of the elements listed" in Restatement (Second) of Torts sec. 417. [L.F. 3340] These objections are materially distinct from arguing that Instruction No. 6 submits an unrecognized theory of recovery, the error raised on appeal.[10]
TWC nonetheless seeks plain error review of its second point on appeal. [TWC's Brief, p. 30] "Plain errors affecting substantial rights may be considered on appeal, in the discretion of the court though not raised or preserved, when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." Rule 84.13(c). "However, the court rarely grants plain error review in civil cases." Syn, Inc. , 200 S.W.3d at 135 (citing Smith v. White, 114 S.W.3d 407, 412 (Mo. App. W.D. 2003) ).
"To establish that [an] instructional error rose to the level of plain error, [TWC] must demonstrate that the trial court so misdirected or failed to instruct the jury that it is evident that the instructional error affected the jury's verdict." Hensley v. Jackson Cnty. , 227 S.W.3d 491, 497-98 (Mo. banc 2007) (citations omitted). TWC has not sustained this burden.
The Restatement (Second) of Torts sec. 417 (1965) addresses work done by an independent contractor in a public place, and provides as follows:
One who employs an independent contractor to do work in a public place which unless carefully done involves a risk of making the physical condition of the place dangerous for the use of members of the public, is subject to liability for physical harm caused to members of the public by a negligent act or omission of the contractor which makes the physical condition of the place dangerous for their use.
Restatement (Second) of Torts sec. 417 cmt. a (1965) states that "[t]he rule stated in this Section frequently is applied to the digging of ditches or placing of building materials on a public highway under a license granted by municipal authorities to do so." The comment continues to provide that "[i]t is not, however, necessary for the rule stated in this Section that the work be done under a franchise, or under a license or permit, or that such a franchise, permit, or license be required in order that the work be done lawfully. It is enough that the work, unless carefully done, will involve making the physical condition of the public place dangerous for the use of the public." Id.
Section 417 is subsumed within a series of rules in the Restatement (Second) of Torts addressing "harm caused by negligence *865 of a carefully selected independent contractor." Restatement (Second) of Torts Topic 2, Introductory Note to sections 416 - 429 (1965). According to the Introductory Note:
The rules stated in the following sections 416 - 429... do not rest upon any personal negligence of the employer. They are rules of vicarious liability, making the employer liable for the negligence of the independent contractor, irrespective of whether the employer has himself been at fault. They arise in situations in which, for reasons of policy, the employer is not permitted to shift the responsibility for the proper conduct of the work to the contractor. The liability imposed is closely analogous to that of a master for the negligence of his servant.
... These exceptions have tended to develop in particular types of fact situations which have tended to be repeated, particularly where the duty of the employer relates to the putting or maintaining of land, structures, and chattels in such a condition as not to be unreasonably dangerous to others....
... The various rules stated tend, to a remarkable extent, to overlap. In the ordinary case two or more of the exceptions which follow are to be found, and the courts have stated all of them, and have applied them more or less indiscriminately to the particular facts....
Restatement (Second) of Torts Topic 2, Introductory Note to sections 416 - 429 (1965).
In Ballinger , our Supreme Court cited to the Introductory Note to Sections 416 - 429, then later observed that "[w]e believe the Restatement correctly reflects Missouri law." 788 S.W.2d at 510-11. While we have not located a Missouri case which expressly relies on the Restatement (Second) of Torts sec. 417 (1965) to support a finding of vicarious liability,[11] in light of Missouri's longstanding recognition of vicarious liability for the acts of independent contractors based on other rules within Sections 416-429 of the Restatement (Second) of Torts, it was not manifestly unjust for the trial court to conclude that Instruction No. 6 submitted a theory of vicarious liability that Missouri has recognized of would recognize.[12]
Point Two on appeal is denied.
The trial court did not err in submitting Instruction No. 7, the verdict director for negligence per se (Point Three)
TWC third point on appeal complains that Instruction No. 7, the verdict *866 director for negligence per se, was legally erroneous because "a violation of section 67.1844 does not support a cause of action for negligence per se in that neither the Video Services Providers Act nor the Right-Of-Way Statutes create a private right of action."[13] [TWC's Brief, p. 37]
Instruction No. 7, the verdict director for negligence per se, read as follows:
In your verdict, you must assess a percentage of fault to defendant Time Warner Cable Midwest, LLC, whether or not plaintiff JJ's Bar and Grill, Inc., d/b/a JJ's Restaurant was partly at fault, if you believe:
First, Defendant Time Warner Cable Midwest, LLC failed to ensure that the performance of the excavation work by Heartland Midwest was in conformance with the applicable safety and construction codes identified in paragraph Second;
Second, Heartland Midwest either:
i. failed to make careful and prudent efforts to confirm the horizontal and vertical location of the MGE gas main prior to operating its underground trenchless boring device in close proximity to the MGE gas main; or
ii. failed to excavate a hole over the MGE gas main to a depth of two feet or more below the planned boring path and then carefully and prudently monitor the horizontal and vertical location of the boring device in a manner calculated to enable the device to be visually observed by the excavator as it crossed the entire width of the marked approximate location of the underground facilities; or
iii. failed to maintain a minimum horizontal separation of three feet and a minimum vertical separation of three feet from other facilities in the right-of-way; and
Third, such conduct directly caused or directly contributed to cause damage to plaintiffs.
TWC's point on appeal does not challenge the form of Instruction No. 7, or whether its submission was supported by the evidence. TWC's point on appeal only challenges whether the statutes identified in the point relied on (section 67.1844, which is one of the Right-of-Way Statutes, or the Video Services Providers Act) support a theory of negligence per se. We conclude that section 67.1844 supports a negligence per se submission under the circumstances in this case. We need not determine whether the Video Services Providers Act supports a negligence per se submission because TWC has not demonstrated that Instruction No. 7 was based on a violation of that Act.[14]
Section 67.1844, a statute within the *867 "Right-of-Way Statutes,"[15] addresses compliance with applicable safety and construction codes, and provides in pertinent part as follows:
1. The performance of excavation work in the public right-of-way shall be in accordance with the applicable safety and construction codes ....
2. Any contractor or subcontractor used for the performance of excavation work in the public right-of-way shall ... have the same obligations with respect to its work as a public utility right-of-way user would have pursuant to section 67.1830 to 67.1846 and applicable laws if the work were performed by the public utility. The public utility right-of-way user shall be responsible for ensuring that the work of contractors and subcontractors is performed consistent with ... applicable law and responsible for promptly correcting acts or omissions by any contractor or subcontractor.
(Emphasis added.) On appeal, TWC does not contest that it was subject to the provisions of section 67.1844.[16]
TWC contends that Paragraph First of Instruction No. 7 is drawn from section 67.1844.[17] [TWC's Brief, p. 39] We agree, as Paragraph First required the jury to find, consistent with the emphasized text in section 67.1844, above, that TWC failed to ensure that Heartland performed excavation work in accordance with "applicable safety and construction codes," specifically those identified in Paragraph Second.
TWC contends that the "applicable safety and construction codes" Heartland failed to follow, and from which subsections (i) and (ii) of Paragraph Second were drawn, are found at section 319.037 of the Underground Facility Safety and Damage Prevention Act. [TWC's Brief, p.40] We agree, as section 319.037 provides in pertinent part as follows:
1. .... the procedures and requirements set forth in this section shall apply on the site of any excavation involving trenchless excavation, including directional drilling, where the approximate location of underground utilities has been marked in compliance with section 319.030 and where any part of the walls of the intended bore are within the marked approximate location of the underground facility.
2. The excavator shall not use power-driven equipment for trenchless exca *868 vation, including directional drilling, within the marked approximate location of such underground facilities until the excavator has made careful and prudent efforts to confirm the horizontal and vertical location thereof in the vicinity of the proposed excavation through methods appropriate .... The excavator shall also make careful and prudent efforts ... to confirm the horizontal and vertical location of the boring device during boring operations. Notwithstanding the foregoing, the excavator shall not be required to confirm the horizontal or vertical location of the underground facilities if the excavator, using the methods described in this section, excavates a hole over the underground facilities to a depth two feet or more below the planned boring path and then carefully and prudently monitors the horizontal and vertical location of the boring device in a manner calculated to enable the device to be visually observed by the excavator as it crosses the entire width of the marked approximate location of the underground facilities .
(Emphasis added.)
TWC contends that the "applicable safety and construction code" which Heartland failed to follow, and from which subsection (iii) of Paragraph Second is drawn, is section 64-116(f)(5) of the Kansas City Code of Ordinances. We agree, as the ordinance in question requires "a minimum horizontal separation of three feet and a minimum vertical separation of three feet from other facilities in the right of way" when using a directional boring method unless a variance is obtained.
TWC does not contest that Heartland's work was subject to section 319.037 and to section 64-116(f)(5) of the Kansas City Code of Ordinances, or that these provisions are examples of the "applicable safety and construction codes" referred to in section 67.1844. TWC does not contest that the evidence was sufficient to permit the jury to conclude that Heartland failed to perform its work as disjunctively submitted in subsections (i) thorough (iii) of Paragraph Second of Instruction No. 7. TWC challenges only whether its failure to ensure that Heartland performed its work in accordance with applicable safety and construction codes (the subject of Paragraph First of Instruction No. 7) permitted submission of vicarious liability based on a theory of negligence per se.
" 'Negligence per se arises when the legislature pronounces in a statute what the conduct of a reasonable person must be and the court adopts the statutory standard of care to define the standard of conduct of a reasonable person.' " Goudeaux v. Board of Police Com'rs of Kansas City , 409 S.W.3d 508, 512 (Mo. App. W.D. 2013) (quoting Dibrill v. Normandy Assoc. Inc. , 383 S.W.3d 77, 84 (Mo. App. E.D. 2012) ). " '[N]egligence per se is in effect a presumption that one who has violated a safety statute has violated his legal duty to use due care.' " Id. at 513 (quoting 57A AM. JUR.2d Negligence section 727 (1989) ). "[W]hen a claim is submitted to a jury on the theory of negligence per se , the verdict director submits the predicate acts or omissions necessary to demonstrate a violation of the statute, and whether the plaintiff was injured as a result." Id. (citation omitted). "[T]he jury is not asked to determine whether those acts or omissions constituted negligence." Id. (citation omitted).
"Four requirements must be met to establish a claim for negligence per se:
*869 1) a violation of a statute or ordinance; 2) the injured party must be within the class of persons intended to be protected by the statute or ordinance; 3) the injury complained of must be of the nature that the statute or ordinance was designed to prevent; and 4) the violation of the statute or ordinance must be the proximate cause of the injury." Lowdermilk v. Vescovo Building and Realty Co., Inc. , 91 S.W.3d 617, 628 (Mo. App. E.D. 2003). "Before we reach the question of a violation [of a statute or ordinance], we must first examine the statute itself to determine if it is a statute on which negligence per se may be premised." Id. ; see Restatement (Second) of Torts sec. 286 cmt. d (1965) (observing that "the initial question is whether the legislation or regulation is to be given any effect in a civil suit," as if the legislation does not so provide, a "court is under no compulsion to accept it as defining any standard of conduct for purposes of a tort action"). TWC's point on appeal hinges entirely on this preliminary inquiry, as TWC argues that the legislature did not intend section 67.1844 to create a statutory exception to the long-standing common law doctrine that employers are not vicariously liable for injuries caused by the negligent conduct of an independent contractor. [TWC's Brief, p. 41]
"The test to determine whether a violation of a statute may constitute negligence per se depends on legislative intent." Lowdermilk , 91 S.W.3d at 629 (citations omitted). We conclude that section 67.1844 was intended to define the standard of care in a negligence action involving a contractor's excavation work in a public right-of-way on behalf of a public utility right-of way user. The plain language of section 67.1844 imposes an obligation to perform all excavation work in the public right-of-way in accordance with applicable safety and construction codes. Section 67.1884.1. It is fair to assume that this legislation was directed to the safety of persons or property. In fact, we can fathom no other purpose for the legislation. "[C]ases will be relatively infrequent in which legislation directed to the safety of persons or property will be so obsolete, or so unreasonable, or for some other reason inapplicable to the case, that the court will take [the] position" that the legislation is "inapplicable for the purposes of defining negligence" in a suit based on its violation. Restatement (Second) of Torts sec. 286 cmt. d (1965). Section 67.1844 provides that a public utility is responsible to ensure that the work of contractors is performed consistent with applicable safety and construction codes, and thus expresses the intent that a public utility will not be insulated from responsibility for performing excavating work in a public right-of-way by delegating the work to a contractor. In effect, section 67.1844 expresses the legislative intent that excavation work in a public right-of-way involves a non-delegable duty to perform that work as required by applicable safety and construction codes.
We therefore conclude that section 67.1844 establishes a standard of care that supports the submission of a negligence per se claim. A public utility who retains a contractor to excavate in a public right-of-way must ensure that all applicable safety and construction codes regarding the excavation work are followed, because the work involves a non-delegable duty that would apply evenly to the utility if it performed the work itself. As such, we are obliged to "adopt[ ] the statutory standard of care to define the standard of conduct of [a] reasonable [public utility right-of-way user]." Lowdermilk , 91 S.W.3d at 628 (citing *870 Restatement (Second) of Torts secs. 286, 288 (1965) ). Paragraph First of Instruction No. 7 did precisely that. It properly instructed the jury on the statutory standard of care when a public utility entrusts excavation work in a public right-of-way to a contractor. Id.
As it happens, the statutory standard of care in section 67.1844 is coextensive with the common law standard of care expressed in the Restatement (Second) of Torts sec. 424 (1965), which provides:
One who by statute or by administrative regulation is under a duty to provide specified safeguards or precautions for the safety of others is subject to liability to the others for whose protection the duty is imposed for harm caused by the failure of a contractor employed by him to provide such safeguards or precautions.
Restatement (Second) of Torts sec. 424 cmt. a (1965) observes:
The rule stated in this Section applies whenever a statute or an administrative regulation imposes a duty upon one doing particular work to provide safeguards or precautions for the safety of others. In such a case the employer cannot delegate his duty to provide such safeguards or precautions to an independent contractor.
(Emphasis added.) Section 67.1844 simply codifies the common law insofar as vicarious liability for the negligent performance of work that is subject to a non-delegable duty of care.
TWC complains that construing section 67.1844 to impose a statutory standard of care permitting submission of vicarious liability for independent contractor negligence on a theory of negligence per se will have the effect of imposing strict liability on public utilities for every imaginable act of negligence by a contractor. We disagree for two reasons.
First, a public utility's responsibility for a contractor's acts under section 67.1844 is limited to ensuring the performance of "safety and construction codes" that are applicable to excavation work in a public right-of-way. A negligence per se submission alleging a public utility is vicariously liable pursuant to section 67.1884 will necessarily be limited in scope to a contractor's acts or omissions which violate a safety or construction code applicable to the manner in which excavation work should be performed. Here, TWC does not dispute that section 319.037 and section 64-116(f)(5) of the Kansas City Ordinances, (from which the submissions in subsections (i) through (iii) of Paragraph Second were drawn), are "safety and construction codes" applicable to the performance of excavation work.
Second, relying on a violation of section 67.1844 to impose vicarious liability on a public utility on a theory of negligence per se will expose the public utility to no greater liability than had it performed the excavation work itself. Section 67.1844 states that a contractor performing excavation work in a public right-of-way for a public utility "shall have the same obligations with respect to its work as a public utility right-of-way user would have." Section 67.1844.2. Here, the disjunctive submissions in Paragraph Second of Instruction No. 7 involving Heartland were framed as negligence per se submissions, as the jury was asked only to find whether the failures to perform specified in subsections (i) through (iii) occurred, and not whether those failures constituted negligence. TWC has not challenged whether Heartland's negligence should have been submitted on *871 a theory of negligence per se. We thus express no opinion whether a violation of section 319.037 or section 64-116(f)(5) of the Kansas City Ordinances supports submission on a theory of negligence per se, or instead requires the additional finding of negligence. See Restatement (Second) of Torts sec. 424 cmt. b (1965) (observing that whether the duty to perform as required by a safety statute or regulation is absolute or subject to a duty of reasonable care is a matter of construction). For our purposes, it is sufficient to note that a public utility cannot be vicariously liable pursuant to section 67.1844 for a contractor's failure to perform in accordance with applicable safety and construction codes beyond the liability the public utility would have if it performed the excavation work for itself. There is no merit to TWC's contention that strict liability will be imposed if vicarious liability based on a theory of negligence per se is recognized for a public utility's violation of section 67.1844.
Beyond TWC's argument that section 67.1844 is not a statute on which negligence per se can be premised, TWC does not otherwise challenge that the four requirements of a negligence per se claim were established in this case. The trial court did not err in submitting Instruction No. 7 to the jury.
Point Three on appeal is denied.
Point Four
TWC's fourth point on appeal challenges the trial court's denial of its motion to strike expert witness testimony because the expert "testified on legal conclusions and legal duties thereby misleading and confusing the jury." [TWC's Brief, p. 55] Specifically, TWC complains that the trial court erred when it denied TWC's motion to strike the expert testimony of Steve Gaw ("Gaw"), a former member of the PSC.
TWC neglects to cite to the motion to strike in the record on appeal, or to the transcript location where the motion to strike was argued. We assume from TWC's point relied on that the motion to strike sought to preclude Gaw from testifying at all. Our independent review of the trial transcript confirms that just before Gaw was called to the stand to testify, TWC's counsel advised the trial court that "[w]e filed a motion to strike him because all of his opinions are just legal opinions ." [Tr. 2702]; (emphasis added). After argument on the record, including voir dire of Gaw in aid of the motion to strike, the trial court denied the motion, and permitted Gaw to testify. Our inquiry is thus limited to determining whether it was error to deny TWC's motion to strike Gaw's expert testimony in its entirety.
"The standard for the admission of expert testimony in civil cases is set forth by section 490.065." Whitnell v. State , 129 S.W.3d 409, 413 (Mo. App. E.D. 2004) (citing State Board of Registration for the Healing Arts v. Edward W. McDonagh , 123 S.W.3d 146, 153 (Mo. banc 2003) ; (additional citation omitted)). "The admission of expert testimony is within the sound discretion of the trial court, and will not be disturbed absent a clear abuse of discretion." Id. at 414 (citing Grab ex rel. Grab v. Dillon , 103 S.W.3d 228, 238 (Mo. App. E.D. 2003) ). "A trial court abuses its discretion when its ruling is clearly against the logic of the circumstances before it and is so arbitrary and unreasonable that it shocks the sense of justice and indicates a lack of judicial consideration." Id. (citing Whitworth v. Jones , 41 S.W.3d 625, 627 (Mo. App. E.D. 2001) ). Even assuming an *872 abuse of discretion in the admission of evidence, "[a] judgment will be reversed only if the prejudice from the improper admission ... of evidence is outcome determinative." Curl v. BNSF Railway Co. , 526 S.W.3d 215, 226 (Mo. App. W.D. 2017) (citing Reed v. Kansas City Mo. Sch. Dist. , 504 S.W.3d 235, 240 (Mo. App. W.D. 2016) ).
The version of section 490.065 in effect at the time of trial provided in pertinent part that:
1. In any civil action, if scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.
2. Testimony by such expert witness in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.
At the beginning of Gaw's direct examination testimony, Gaw testified about his background and expertise as a former member of the PSC, and explained that following legislation enacted in 2007, video service providers like TWC were required to secure franchise authorization from the PSC to access public rights-of-way. Gaw explained the process a video service provider follows to secure franchise authorization, which includes filing an application and an accompanying affidavit affirming the provider's agreement to comply with all applicable federal and state laws and regulations. Gaw then identified the application and accompanying affidavit TWC filed with the PSC to secure franchise authorization to access public rights-of-way. This testimony (which did not include legal opinions) was not objected to by TWC, and assisted the jury in understanding the evidence. The testimony was also relevant to permit the trial court to legally determine whether TWC was a "public utility right-of-way user" subject to section 67.1844,[18] a predicate to submission of the negligence per se verdict director (Instruction No. 7).
Standing alone, the lack of an objection to this portion of Gaw's expert testimony is fatal to TWC's point on appeal. The trial court did not err in denying a pre-testimony motion to strike which sought to prevent Gaw from testifying at all when Gaw later offered admissible expert testimony as to which no objection was made.
As Gaw's testimony continued, TWC did object, specifically when Gaw began offering his opinion about the meaning of various provisions in chapter 67. TWC objected that Gaw "was now getting into the area of legal duty, which is not proper for expert opinion." [Tr. 2739] The trial court denied the objection, and permitted TWC to have "a continuing objection during the whole course of [Gaw's] testimony." [Tr. 2739-40]
Thereafter, and loosely summarized, Gaw: (i) testified that all public utilities are required to comply with statutory provisions relating to use of the public right-of-way; (ii) identified the video services authorization issued by the PSC to TWC; (iii) pointed out the provision in TWC's video services authorization that gives TWC the *873 authority to install video services along, across or on public rights-of-way; (iv) explained that he had reviewed the written contract between Heartland and TWC, and discussed Heartland's legal obligations in excavating on TWC's behalf; (v) identified a copy of the Right-Of-Way Statutes, sections 67.1830 to 67.1844, and generally explained that the Right-Of-Way Statutes address the use of public rights-of-way by public utilities; (vi) noted the provision in the Right-Of-Way Statutes that defines "public right-of-way;" (vii) noted that the Right-Of-Way Statutes require excavation work to be done in accordance with applicable laws; (viii) identified a copy of the Video Services Providers Act of 2007 which authorizes the issuance of a franchise to video service providers; (ix) explained that the Video Services Providers Act specifies other provisions in the law which video service providers are obligated to follow, including Chapter 67, the National Electrical Code, and Chapter 319; (x) opined that installing a fiber optic cable underneath the public rights-of-way near JJ's qualified as an excavation activity controlled by the Right-Of-Way Statutes; (xi) opined that section 67.1844 is a part of the Right-Of-Way Statutes; (xii) opined that the provisions of section 67.1844 are mandates and not guidelines; (xiii) opined about the meaning of the provision in section 67.1844 addressing a contractor's obligation to perform excavation work in a public right-of-way pursuant to the same laws that would be applicable to the public utility; (xiv) opined that section 67.1844 prohibited TWC from relieving itself of the obligation to comply with laws applicable to excavation work by delegating that work to a contractor; (xv) identified a copy of the Underground Facility Safety and Damage Prevention Act [chapter 319], and explained how the Act governs excavation work in Missouri and is referred to as the "One Call Act;" (xvi) described the general thrust of the One Call Act; (xvii) opined that the One Call Act includes provisions regarding safety precautions which must be taken with respect to HDD trenchless technology; (xviii) identified a copy of a section of the National Electric Code; (xix) identified a copy of the Kansas City Ordinance relating to excavation work in a public right-of-way; and (xx) opined that authorized video service providers are required to follow the National Electric Code and ordinances related to excavation work adopted by political subdivisions like Kansas City. At the conclusion of his direct testimony, Gaw testified that:
[A] video services provider, Time Warner in this case, must follow the laws regarding excavation work. They have to follow the laws of the State of Missouri, they have to follow the national electric code, they have to follow the Kansas City ordinances. And if they have someone else do work for them, which the law provides them the ability to do, they have to ensure that that law is followed and they are responsible just as though they were doing the work for that activity. That's basically it, I would say, in a nutshell.
[Tr. 2762-63]
Some of the aforesaid topics about which Gaw testified subject to TWC's continuing objection were not "legal conclusions or opinions." However, some of Gaw's testimony provided over TWC's continuing objection plainly involved legal opinions and conclusions, including opinions on the subject of TWC's legal duties, and the extent to which those duties made TWC vicariously liable for the negligence of Heartland. Although an expert witness is permitted to opine on "ultimate facts" that *874 will be submitted to a jury for determination, Gaw's opinions about the meaning of statutes or regulations, about whether those statutes or regulations impose legal duties on public utilities or contractors, and about the legal effect of those duties, did not involve "facts," ultimate or otherwise. Rather, those opinions involved pure issues of law. "Generally, expert testimony on issues of law is inadmissible because this testimony 'encroaches upon the duty of the court to instruct on the law.' " Hill v. City of St. Louis , 371 S.W.3d 66, 77 (Mo. App. E.D. 2012) (quoting Howard v. City of Kansas City , 332 S.W.3d 772, 785 (Mo. banc 2011) (additional quotation omitted)). "The judge's own legal knowledge makes such testimony superfluous." Id. (citing Wulfing v. Kansas City Southern Ind. , 842 S.W.2d 133, 153 (Mo. App. W.D. 1992), overruled on other grounds by Executive Bd. of Missouri Baptist Convention v. Carnahan , 170 S.W.3d 437, 447 n. 5 (Mo. App. W.D. 2005) ).
JJ's Restaurant and JJ's Building argue that Gaw's legal opinions were not improper, and were instead proper "expert testimony on complex procedural matters, industry standards, and highly technical statutes and regulations" permitted "to allow the jury to evaluate the conduct of the parties, even though the testimony covers matters of law." Id. It is true that "[a] witness qualified as an expert in [a complex area of regulation] ... is competent to explain to the jury 'the step-by-step practices ordinarily followed [by those attempting to follow the regulations] ... [as such] [t]estimony ... is admissible under the same theory as testimony concerning the ordinary practices of physicians or concerning other trade customs: to enable the jury to evaluate the conduct of the parties against the standards of ordinary practice in the industry.' " Id. (quoting Wulfing , 842 S.W.2d at 153-54 ) (itself quoting Marx & Co. v. Diners' Club, Inc. , 550 F.2d 505, 508 (2nd Cir. 1977) ). However, Gaw's legal opinion testimony far exceeded an attempt to walk the jury through the ordinary steps a public utility takes to excavate a public right-of-way as a part of testimony designed to establish standards of ordinary practice in the industry. Gaw's legal opinion testimony interpreted statutes and regulatory provisions, and announced legal duties of public utilities and excavation contractors based on those statutes and regulatory provisions, matters of law reserved for the trial judge. See, e.g., State v. Morrow , 535 S.W.2d 539, 540 (Mo. App. K.C. Dist. 1976) ("The meaning to be accorded a statute is for the court and not the dialectic of experts.") (citing State v. Carter , 475 S.W.2d 85, 90 (Mo. 1972) ); Vittengl v. Fox , 967 S.W.2d 269, 274 (Mo. App. W.D. 1998) (" '[Duty] is entirely a question of law ... and it must be determined only by the court.' ") (quoting W. Page Keeton, Prosser and Keeton on Torts sec. 37 (5th ed. 1984)).
Though some of Gaw's testimony was inadmissible legal opinion testimony, TWC has not claimed error based on the trial court's denial of the objection it made during Gaw's testimony, and has not identified the portions of Gaw's testimony properly subject to the objection.[19] Instead, TWC's point on appeal challenges the denial of a pre-testimony motion to strike which sought to exclude Gaw's testimony in its *875 entirety. Because some portions of Gaw's testimony were properly admitted, and would not have been subject to exclusion as improper legal opinions, the trial court did not commit error in denying TWC's motion to strike Gaw's testimony in its entirety.
It is worth noting that even assuming TWC's point on appeal had been tailored to claim error in denying an objection limited to only those portions of Gaw's testimony which constituted improper legal opinions, error in the admission of Gaw's legal opinions would not warrant reversal unless "prejudice from the improper admission ... is outcome determinative." Curl v. BNSF Railway Co. , 526 S.W.3d 215, 226 (Mo. App. W.D. 2017).
TWC has not explained how those portions of Gaw's testimony involving improper legal opinions were outcome determinative. TWC broadly argues that Gaw's testimony was prejudicial because "the trial court effectively abdicated its own role as the sole arbiter of the law and left it to the jury to believe or disbelieve whether Gaw was right on the law." [TWC's Brief, p. 58] However, TWC has not explained where any of the verdict directors asked the jury to believe or disbelieve that Gaw was "right on the law." We find they did not. Rather, Gaw's legal opinions regarded matters that were ultimately determined solely by the trial court in connection with its decision to submit the verdict directors in this case.[20] In that respect, Gaw's legal opinions, though improper, were superfluous. Hill , 371 S.W.3d at 77 ("The judge's own legal knowledge makes such testimony superfluous.").
Point Four on appeal is denied.
Cross-Appeal
JJ's Restaurant and JJ's Building assert a single point in their cross-appeal, and claim error in the post-trial reduction of judgments in their favor by the amount of settlement payments each received from MGE and Heartland. They claim that the settlement payments were in dispute, and that TWC was thus required to submit proof of its right to reduction before the jury was discharged. The proper standard of review of this specific issue is de novo. McGuire v. Kenoma, LLC , 375 S.W.3d 157, 179 (Mo. App. W.D. 2012) (citing Gibson v. City of St. Louis , 349 S.W.3d 460, 465 (Mo. App. E.D. 2011) ).
Section 537.060 addresses contribution between tort-feasors, and the effect of a release of one or more tort-feasors. It provides, in pertinent part, as follows:
When an agreement by release, covenant not to sue or not to enforce a judgment is given in good faith to one of two or more persons liable in tort for the same injury or wrongful death, such agreement shall not discharge any of the other tort-feasors for the damage unless the terms of the agreement so provide;
*876 however, such agreement shall reduce the claim by the stipulated amount of the agreement, or in the amount of consideration paid, whichever is greater.
"The statute 'implements the common law rule that a plaintiff is entitled to one satisfaction for a wrong.' " Payne v. Markeson , 414 S.W.3d 530, 539 (Mo. App. W.D. 2013) (quoting Gibson, 349 S.W.3d at 465 ). "For the purposes of statutory reduction, a rebuttable presumption of joint liability for the same injury ... can arise from the plaintiff's pleadings and ensuing settlement. Once that presumption arises, it falls to the plaintiff to show that the injuries are divisible." Sanders v. Ahmed , 364 S.W.3d 195, 213 (Mo. banc 2012).
" 'A reduction under section 537.060 is a satisfaction of an amount owed,' and '[s]atisfaction is an affirmative defense' which 'must be pleaded and proved.' " Payne , 414 S.W.3d at 539 (quoting Norman v. Wright , 100 S.W.3d 783, 785 (Mo. banc 2003) ). " 'The defendant bears the burden of pleading and proving the elements of the defense.' " Id. at 539-40 (quoting Sanders , 364 S.W.3d at 211 ). "Those elements are: (1) the existence of a settlement, and (2) the stipulated amount of the agreement or the amount in fact paid." Id. at 540 (citing Sanders , 364 S.W.3d at 211-12 ).
JJ's Restaurant and JJ's Building do not challenge that their original pleadings and ensuing settlements with MGE and Heartland created a presumption of joint tort-feasor liability they have not rebutted for purposes of statutory reduction pursuant to section 537.060. Nor do they challenge that TWC properly pleaded the affirmative defense of reduction.[21] The only issue JJ's Restaurant and JJ's Building contest on appeal is whether TWC properly proved the affirmative defense of reduction. JJ's Restaurant and JJ's Building argue that "TWC should have offered its proof at trial," and "before the jury was discharged," and should not have held that proof for submission in a post-trial motion to amend the judgment. [JJ's Restaurant and JJ's Building's Brief, pp. 51, 53]
In Payne , this court rejected the argument that a defendant failed to "prove" her affirmative defense of reduction when she filed a post-trial motion to reduce the judgment by undisputed settlements paid by joint tort-feasors. 414 S.W.3d at 540-43. We observed in Payne that there is no authority for the blanket proposition that the reduction defense "must be proven before the jury," and is waived if no attempt is made to prove the defense at trial. Id. at 542 (citing McGuire , 375 S.W.3d at 182 ). As Payne noted, the McGuire court "rejected the ... contention that 'set off [reduction] is never properly raised after verdict.' " Id. at 540 (quoting McGuire , 375 S.W.3d at 181 ).
In fact, a 2012 revision to MAI 1.06 reflects as much, as it instructs that:
No instruction shall be given directing the jury to credit its verdict with the amount of any undisputed advance payment or partial settlement.
Comment A to MAI 1.06 [2012 Revision] observes that:
*877 This prohibition applies to undisputed... partial settlements. If there is a dispute about such prior payments, see the discussion in the last paragraph of this Committee Comment, MAI 7.02, and for of verdict MAI 36.19. When disputed, evidence will be adduced at trial and the matter submitted to the jury under appropriately modified instructions and verdict form.
Comment B to MAI 1.06 [2012 Revision] observes in pertinent part that:
Handling of any undisputed payment to be credited against plaintiff's claim is a matter of procedure....
Comment H to MAI 1.06 [2012 Revision] observes that:
Under this procedure, the parties should make a record out of the hearing of the jury regarding undisputed prior settlement payments made either as an advancement by the defendant or as a partial settlement payment by a joint tortfeasor. The trial judge, as a matter of law, then will take any such prior payments into consideration and will credit them on the damages assessed by the jury's verdict as required by law.
MAI 1.06 does not dictate when the "record" regarding undisputed prior settlement payments can or should be made, noting only that it must be made out of the hearing of the jury. Since reduction of a judgment by undisputed prior settlement payments is not a proper jury issue as a matter of law, it follows that so long as a trial court retains authority over its judgment, it retains authority to amend the judgment to make reductions for undisputed prior settlement payments. See Payne , 414 S.W.3d at 542-543 (explaining that although the better practice would be to reduce verdicts by undisputed settlement payments before judgment is entered, a trial court is authorized to reduce a judgment for undisputed settlement payments at any point during the time the court "retain[s] jurisdiction over the case"); McGuire , 375 S.W.3d at 182-83.
Recognizing this precedent, JJ's Restaurant and JJ's Building argue that the settlement payments in this case were "disputed" because: "First, the total amount claimed [as a proper reduction] was disputed.... [and] [s]econd, it was disputed how the prior settlements should be allocated." [JJ's Restaurant and JJ's Building's Brief, pp. 54-55] The first contention is based on the fact that TWC's motion to amend sought reduction by the total amount of all settlement payments made by MGE and Heartland, including a settlement payment made to Jimmy Frantze. The second contention is based on the fact that TWC's motion to amend did not expressly state how the settlement payments made by MGE and Heartland should be allocated between the separate judgments entered in favor of JJ's Restaurant and JJ's Building.
No Missouri case has addressed when a settlement payment should be characterized as "disputed." However, MAI 1.06 [2012 Revision] provides guidance on this topic, and states at Comment I that:
If there is a disputed issue as to whether there was a settlement payment, as to whether a certain payment was attributable to a settlement, or as to the amount of a settlement payment, this issue is submitted to the jury by modifying the damage instruction as required by current MAAI 7.02 and using Form of Verdict MAI 36.19.
Here, the MGE and Heartland settlement agreements were filed under seal with the *878 trial court on December 29, 2014 and April 24, 2015, respectively. Aware of the settlements and of TWC's affirmative defense seeking reduction, the trial court's initial judgment expressly indicated that it was entered "subject to offsets or credits that this court deems appropriate pursuant to any and all post-trial motions." TWC's post-trial motion to amend the judgment attached the MGE and Heartland settlement agreements.
The settlement agreements identify several discrete settlement payments, the amount of each settlement payment, and to whom each settlement payment was made. One joint tort-feasor made discrete settlement payments to JJ's Restaurant, to JJ's Building, and to Jimmy Frantze. The other joint tort-feasor made discrete settlement payments to JJ's Restaurant and to JJ's Building.[22]
It is thus undisputed that settlement payments were made. The amount and recipient of each settlement payment is also undisputed. As a result, the amounts paid to JJ's Restaurant and JJ's Building that must reduce their respective judgments as a matter of law is not in dispute.
However, TWC's motion to amend also argued that the judgments should be reduced by the settlement payment to Jimmy Frantze, which TWC characterized as a "hidden" payment to one or both of the JJ's entities. Whether the settlement payment to Jimmy Frantze should be attributable to JJ's Restaurant or JJ's Building involves a dispute "as to whether a certain payment was attributable to a settlement." MAI 1.06 [2012 Revision] Comment I (emphasis added). TWC was obligated to submit this disputed issue "to the jury by modifying the damage instruction as required by ... MAI 7.02 and using Form of Verdict MAI 36.19." Id. Consistent with this fact, the trial court did not grant TWC's post-trial motion to amend insofar as it sought to reduce the judgments in favor of JJ's Restaurant and JJ's Building by the disputed settlement payment to Jimmy Frantze. The trial court only reduced the judgments by the undisputed settlement payments to JJ's Restaurant and JJ's Building.[23]
JJ's Restaurant and JJ's Building contend that TWC's insistence of a reduction for the disputed settlement payment to Jimmy Frantze rendered all of the settlement payments made by MGE and Heartland disputed, requiring the issue of reduction to be submitted to the jury. We cannot fault JJ's Restaurant and JJ's Building for attempting to exploit the position taken by TWC in its post-trial motion to amend. However, there is no authority for the proposition that a dispute involving one settlement payment automatically renders all other settlement payments disputed.
*879 Rather, in a case involving multiple settlement payments, a trial court is required to submit any disputed settlement payments to the jury, while it is at the same time prohibited from submitting any undisputed settlement payments to the jury. MAI 1.06 [2012 Revision] (prohibiting the submission of any undisputed settlement payments to the jury); MAI 1.06 [2012 Revision] Comment B (providing that "[h]andling of any undisputed payment to be credited against plaintiff's claim is a matter of procedure") (emphasis added); MAI 1.06 [2012 Revision] Comment H (providing that a trial judge shall, as a matter of law, credit "undisputed prior settlement payments " on "the damages assessed by the jury's verdict") (emphasis added); MAI 1.06 [2012 Revision] Comment I (requiring submission to the jury if there is a disputed issue "as to whether a certain payment was attributable to a settlement") (emphasis added).
Here, had the disputed settlement payment to Jimmy Frantze been submitted to the jury as required, the jury's resolution of whether that "certain payment" should be attributed to a settlement with JJ's Restaurant or JJ's Building would not have altered the undisputed settlement payments plainly made by MGE and Heartland to JJ's Restaurant and JJ's Building. At most, the jury's resolution of the disputed settlement payment to Jimmy Frantze would have required reduction of one or both of the JJ's entities' judgments by an additional settlement payment.
We conclude that the trial court correctly refused to reduce the judgments in favor of JJ's Restaurant and JJ's Building by the disputed settlement payment to Jimmy Frantze, as the disputed settlement payment was not eligible for post-trial reduction. However, the disputed settlement payment to Jimmy Frantze did not convert the undisputed payments to JJ's Restaurant and JJ's Buildings into disputed settlement payments. The trial court did not err in reducing the judgments post-trial by the undisputed settlement payments made by MGE and Heartland to JJ's Restaurant and JJ's Building.
Cross-appeal point denied.
Conclusion
The trial court's Judgment is affirmed.
All concur

We view the evidence and the reasonable inferences drawn therefrom in the light most favorable to the verdict. Johnson v. Auto Handling Corporation , 523 S.W.3d 452, 460 (Mo. banc 2017).

Missouri One Call was established pursuant to the "Underground Facility Safety and Damage Prevention Act," RSMo section 319.010 through section 319.050, to provide a single point of contact for notification to its utility members of requests by excavators for the location of underground gas, electrical, water, sewer, and other utilities.

The jury's verdict assessing 2% fault to JJ's Restaurant did not assess fault to JJ's Building. It is unclear why the judgment in favor of JJ's Building was reduced by a comparative fault allocation. However, that issue has not been raised on appeal.

All statutory references are to RSMo 2016, unless otherwise specified.

Although framed as first a question of law, and then a question of fact, in reality, a trial court's determination to submit whether an activity is inherently dangerous to the jury is subject to the same assessment as any other factual issue in dispute-does substantial evidence exist in the trial record to permit submission of the factual issue to the jury for its determination. If not, the issue is not submissible as a matter of law. Hatch v. V.P. Fair Foundation, Inc. , 990 S.W.2d 126, 134 (Mo. App. E.D. 1999) (holding that "noting that the question is initially one of law" simply means "that the trial court must initially decide as a question of law whether or not a plaintiff has made a submissible case") (citing Zueck v. Oppenheimer Gateway Properties, Inc. , 809 S.W.2d 384, 386 (Mo. banc 1991) ).

The bracketed phrase is to be added to the definition of "inherently dangerous activity" if supported by the law and evidence and requested by the defendant." MAI 16.08, Notes on Use 2 (citing Ballinger v. Gascosage Elec. Co-op. , 788 S.W.2d 506, 511 (Mo. banc 1990) ; and Restatement (Second) of Torts sec. 426 (1965) ).

Restatement (Second) of Torts sec. 427 cmt. a (1965) provides that "[t]he rule stated in this Section is closely related to, and to a considerable extent a duplication of, that stated in Section 416, as to work likely to create a peculiar risk of harm to others unless special precautions are taken." Restatement (Second) of Torts sec 416 cmt. a (1965) states that "[t]here is a close relationship between the rule stated in this Section, and that stated in Section 427, as to dangers inherent in or normal to the work. The two rules represent different forms of statement of the same general rule, that the employer remains liable for injuries resulting from dangers which he should contemplate at the time that he enters into the contract, and cannot shift to the contractor the responsibility for such dangers, or for taking precautions against them. The rules stated in the two Sections have been applied more or less interchangeably in the same types of cases, and frequently have been stated in the same opinion as the same rule, or as different phases of the same rule."

Similar conclusions were reached in the following cases: Smith v. Inter-County Telephone Co. , 559 S.W.2d 518 (Mo. banc 1977) (finding that digging a narrow vertical trench is an inherently dangerous activity because it may collapse and cause injury unless properly shored) (overruled on other grounds by Matteuzzi v. Columbus Partnership, L.P. , 866 S.W.2d 128 (Mo. banc 1993) ); Ballinger , 788 S.W.2d at 509-12 (finding the activity of installing conductors in the vicinity of an energized electric line was inherently dangerous).

The continued relevance of Hofstetter and cases like it addressing an employer's liability for injury to a worker employed by an independent contractor was all but eliminated by our Supreme Court's decisions in Zueck , 809 S.W.2d 384 and Matteuzzi , 866 S.W.2d 128. Zueck and Matteuzzi combine to hold that an employer or landowner cannot be liable to employees of independent contractors covered by workers' compensation on either a theory of vicarious liability arising out of an inherently dangerous activity, or on a theory of direct liability.

TWC did argue in its motion for directed verdict at the close of the evidence that vicarious liability for work performed by an independent contractor in a public place is not a recognized theory for recovery in Missouri. However, this did not preserve a claim of instructional error.

JJ's Restaurant and JJ's Building note that Restatement (Second) of Torts section 417 was relied on to support a finding of vicarious liability in Hodge v. Virgin Islands Tel. Corp. , No. ST-12-CV-298, 2014 WL 1508493, at *6 (V.I. Super. April 11, 2014), a case involving the above ground installation of fiber optic cable in public places. However, Hodge involved work that obviously created a dangerous condition in a public area rendering the area unsafe for public use, as the plaintiff there was hit on the head in a public place by a cable that fell while being installed. Here, the evidence established that HDD trenchless technology avoids open trenches and street cuts that can render public places dangerous. However, TWC has not argued that Instruction No. 6 should not have been submitted because HDD work, whether or not performed with adequate precautions, does not create a condition in a public place that renders the public place dangerous for public use.

We express no opinion as to whether submission of Instruction No. 6 was supported by substantial evidence, an issue not raised by TWC on appeal. See note 11, supra. It is also unnecessary to address TWC's contention that Missouri has not recognized the Restatement (Third) of Torts sec. 64(b) (2012) which provides that "[a]n actor who hires an independent contractor for activity in a public place is subject to vicarious liability for physical harm if the independent contractor's negligence is a factual cause of any such harm within the scope of liability."

There is a difference between whether a statute creates a private right of action permitting an individual to initiate a lawsuit seeking relief based on a violation of the statute, and whether a statute establishes a standard of care supporting recovery on a theory of negligence per se because violation of the statute relieves the jury of the obligation to find negligence. However, we are cognizant that some Missouri cases addressing negligence per se speak in terms of whether the referenced statute creates a private right of action. Technically, however, the doctrines are distinguishable.

See note 17, infra.

See sections 67.1830 to 67.1848.

TWC applied for video service provider authorization from the PSC pursuant to section 67.2679, which addresses the PSC's authority to regulate video service providers. Section 67.2679 is referred to by TWC in its Brief as the "Video Services Providers Act." Section 67.2679 requires the PSC to issue a video service provider authorization upon submission of an applicant's compliant affidavit which avers, among other things, that the applicant "agrees to comply with all applicable federal and state laws and regulations." Section 67.2679.7(1). The evidence supports the conclusion that TWC submitted a compliant affidavit which included this affirmation.

In the argument portion of its Brief, TWC never explains how Instruction No. 7 is drawn from the Video Services Providers Act. Thus, although TWC's point relied on argues that there is no private right of action for violation of the Video Services Providers Act, TWC does not explain how Instruction No. 7 was based on a violation of the Video Services Provider Act. See note 16, supra. "Arguments raised in the points relied on which are not supported by argument in the argument portion of the brief are deemed abandoned and present nothing for appellate review." Beermann v. Jones , 524 S.W.3d 545, 551 n. 3 (Mo. App. W.D. 2017) (quotation omitted).

As noted, supra , TWC does not challenge on appeal that it was subject to section 67.1844. However, in summary judgment pleadings, TWC argued that its status as a public utility right-of-way user was a fact in dispute.

TWC was granted a continuing objection when it first objected during Gaw's testimony. Had TWC's point on appeal claimed error in denying this continuing objection (which it did not), TWC would nonetheless have been required to identify the testimony thereafter elicited from Gaw which fell within the scope of the continuing objection.

For example, TWC argues that Gaw was wrong on the law because TWC had no statutory duty whose violation supported submission of a negligence per se claim. The trial court, however, and not the jury, determined that section 67.1844 supported submission of a negligence per se claim. We have already explained that this legal determination was not erroneous. The negligence per se verdict director only asked the jury to determine whether certain conduct occurred. It was the trial court that determined that the conduct, if it occurred, violated section 67.1844 as to support submission on a theory of negligence per se.

TWC's answer to JJ's Restaurant and JJ's Building's second amended petition alleged that plaintiffs' "damages should be reduced by the greater of any amounts received or agreed to in settlement with any party and/or non-party" pursuant to section 537.060, and further alleged that settlements had been reached between plaintiffs and MGE and Heartland, both of whom are joint tort-feasors jointly and severally liable for plaintiffs' damages. [L.F. 2937-38]

We are not stating the amount of the settlement payments made by MGE or Heartland given the confidential nature of the settlement agreements. The collective amounts paid by MGE and Heartland to JJ's Restaurant and JJ's Building can be discerned by a simple comparison of the amount of the judgments awarded each before and after reduction. However, this comparison does not reveal the specific amounts paid by MGE and Heartland to either of the JJ's entities, nor the amount paid (or by whom) to Jimmy Frantze.

TWC has not contested the trial court's refusal to reduce the judgment by the settlement payment to Jimmy Frantze. Perhaps TWC is now cognizant of the fact that its post-trial attempt to secure a reduction for the relatively small settlement payment to Jimmy Frantze potentially imperiled the sizeable post-trial reduction it was otherwise plainly entitled to receive for undisputed settlement payments made to JJ's Restaurant and JJ's Building.